John SCHEBLE and Mary Scheble, Respondents,

v.

MISSOURI CLEAN WATER COMMISSION and Missouri Department of Natural Resources, Appellants.

No. 51708.

Missouri Court of Appeals, Eastern District, Division Four.

May 26, 1987.

Motion for Rehearing and/or Transfer Denied June 24, 1987.

Application to Transfer Denied Sept. 15, 1987.

William Webster, Atty. Gen., Douglas Lind, Sp. Asst. Atty. Gen., Jefferson City, for appellants.

Larry Robertson, High Ridge, John W. Hammon, Anderson, Hammon, Dieffenbach & Schnaare, Hillsboro, for respondents.

SIMON, Judge.

■ Appellants, the Missouri Clean Water Commission (Commission) and Missouri Department of Natural Resources (DNR), appeal from a judgment entered in the Circuit Court of Jefferson County, vacating an administrative order issued by the Commission on January 24, 1984. Respondents, John and Mary Scheble, did not see fit to file a brief in this court, even though the record on appeal is voluminous. The legal file alone exceeds 1300 pages and the transcript of the hearing before the Commission exceeds 1250 pages. It is the policy of Missouri appellate courts to encourage briefs and oral arguments by both parties. *Long v. Stilwell Homes, Inc.,* 333 S.W.2d 103, 104 (Mo.App.1960). In failing to file a brief, the Schebles have indulged in a practice repeatedly condemned by the courts. *See, e.g., Hunter v. Schwertfeger,* 407 S.W.2d 606, 608 (Mo.App.1966) and cases cited therein. Failure of a respondent to file a brief is an imposition on this court and leaves us dependent upon appellants' presentation and our own research. However, because no penalty is imposed by statute or rule, we will proceed to determine the case on its merits. *Olsen v. Bernie's, Inc.,* 296 S.W.2d 3, 5 (Mo.1956).

On appeal, appellants raise four points with numerous subpoints. Essentially, appellants contend that the trial court erred: (1) in reversing the administrative order of the Commission on evidentiary grounds because said order was supported by substantial and competent evidence; (2) in reversing the order of the Commission on remedial grounds because the Commission is entrusted with the enforcement of the clean water law and is empowered to issue any order appropriate under the circumstances; (3) in concluding that the Commission was estopped by laches from proceeding against the Schebles; and (4) in holding that the Schebles were denied a fair hearing by the Commission due to an allegedly biased and partial hearing officer.

This case concerns the Wood View Acres Subdivision, located in Jefferson County, Missouri. Approximately 31 homes, situated on lots ranging from .42 to 3.51 acres, are located on the gently rolling hills of Wood View Acres, about twenty miles south of St. Louis. Undeveloped woods and fields form the rear lot lines for most yards, and a intermittent creek flowing out of a pond located at the northeast corner of the development weaves through the subdivision. According to the Commission and DNR the pond and creek are polluted. Discharge pipes connected to individual home sewage treatment systems drip partially treated sewage at points just beyond lot lines in the woods, fields, road ditches, and directly into the creek bed and pond.

According to the findings of fact made by the Commission, the chronicle of Wood View Acres began in the winter of 1975–76 when L.K. Wood Realty Co., Inc. (L.K. Wood) made three separate purchases of contiguous tracts of land in U.S. Survey 3059, Township 43N, Range 4E, Jefferson County, Missouri. L.K. Wood then entered into an alleged agreement with Gardner Planning and Construction, Inc. to develop a subdivision on the newly acquired real estate.

L.K. Wood, a Missouri corporation, was incorporated on June 4, 1958. On June 1, 1979, the company's corporate name was formally changed from L.K. Wood Realty Co., Inc. to Murwood, Inc. For the sake of brevity and consistency we use L.K. Wood throughout this opinion. As a point of clarity, we mention that the Commission had also appealed the reversal of its order directed to L.K. Wood. As the administrative proceedings below against the Schebles and L.K. Wood had been consolidated throughout, we had consolidated the appeals. However, L.K. Wood has since settled with the Commission and that appeal has been dismissed.

On April 9, 1976, L.K. Wood filed a subdivision plat entitled "Wood View Acres"

with the recorder of deeds for Jefferson County. This plat contemplated the development of a nine lot subdivision on one of the tracts purchased. On August 5, 1976, L.K. Wood recorded a deed of restrictions for the area plotted Wood View Acres and a two acre tract adjacent thereto which constituted the second of the tracts purchased by L.K. Wood. The deed of restrictions, inter alia, granted utility easements, placed restrictions upon the uses allowed for the property, the lot size, square footage, materials that could be employed in construction, animals, automobiles, and machinery that could be kept on the property. The deed also provided for the creation of a Board of Trustees to manage and maintain the development and to levy and collect an annual assessment fee from each lot owner.

During 1974, 1975, and 1976, John and Mary Scheble purchased from Rutledge R. Mayo three separate but contiguous tracts of land in U.S. Survey 3059, Township 43N, Range 4E, Jefferson County, Missouri. The land purchased by the Schebles is adjacent to the three tracts purchased by L.K. Wood in the winter of 1975–76. (These purchases are represented by areas F and E on the diagram set forth in the appendix of this opinion. Area E consists of the two southern most properties purchased. The diagram is taken from DNR Exhibit 28A. References to appendix shall be by tracts D, E, and F).

On May 5, 1977, L.K. Wood and John and Mary Scheble executed an amendment to the deed of restrictions for Wood View Acres. The amendment, which was recorded in Jefferson County on May 17, 1977, extended the metes and bounds of the real estate to which the deed of restrictions applied. The properties owned by the Schebles with which the amendment was concerned were the three purchased from Rutledge R. Mayo. The amendment caused all properties owned by the Schebles in U.S. Survey 3059, Township 43N, Range 4E (i.e. the three tracts purchased from Rutledge Mayo) to become joined as a contiguous unit covered by the same set of restrictive covenants with all properties owned by L.K. Wood in the same U.S.

Survey (i.e. the three tracts purchased in the winter of 1975–76).

On May 11, 1977, L.K. Wood conveyed a 4.2 acre tract of real estate to the Schebles by a general warranty deed. (Tract D—appendix). The deed was recorded at the same time as the amendment to the deed of restrictions. The 4.2 acre tract was part of the three purchases made by L.K. Wood in the winter of 1975–76 and was covered by the amendment to the deed of restrictions.

About this time, the Schebles contacted Metropolitan Engineering Co. (Metropolitan) to have some survey work done on their properties. In May of 1977, Robert Eade, an engineer for Metropolitan, prepared and presented to the Schebles a preliminary drawing covering the southern two of the three tracts purchased from Rutledge Mayo (Tract E), as well as the 4.2 acre tract acquired from L.K. Wood. (Tract D). This drawing divided the property into thirteen numbered lots. Subsequently, the Shebles asked Metropolitan to schematize a subdivision plat. The plat was completed on June 6, 1977. This subdivision plat, entitled "Wood View Acres Addition," covered only the two southern tracts purchased from Mayo. (Tract E). It differed from the preliminary drawing in that the 4.2 acre tract acquired from L.K. Wood was (Tract D) excluded (lots 11, 12, & 13) and the numbering of the lots on the remaining tracts was changed. Lot 1 on the preliminary drawing was designated "outlot" on the plat and the remaining lots 2 through 10 on the preliminary sketch were correspondingly renumbered 1 through 9. According to Mary Scheble, the "outlot" was designated as such because there was a house already in existence on the lot, but the boundaries had not been determined. When Metropolitan Engineering was hired, the Schebles asked it to provide boundaries for that lot as well as the further lot divisions. It is not clear who chose the designation "outlot" for the former lot 1. The plat was recorded on July 13, 1977 with the recorder of deeds for Jefferson County.

On June 9, 1977, Eade prepared an unrecorded survey of the 4.2 acre tract (Tract

D) for the Schebles. The survey was in accordance with the preliminary sketch of the property. The survey contained three lots designated A, B, and C, which corresponded to lots 11, 12, and 13 on the preliminary drawing.

Metropolitan also drafted a water line extension diagram for the Schebles in June of 1977. This diagram included all three tracts of property purchased from Mayo, as well as the 4.2 acre tract acquired from L.K. Wood, i.e., Tracts D, E, and F. It showed a total of sixteen lots, nine of which were numbered and one of which was labeled "outlot" (the labeled and numbered lots corresponded to the recorded plat). The diagram's specifications contemplated water line service to 16 connections. On June 30, 1977, the diagram was submitted for approval to DNR's central office in Jefferson City, Missouri. DNR did not approve of the water line extension diagram initially. The diagram was ultimately approved in August 1977, after modifications not here relevant. However, the Water Pollution Control Section of DNR's St. Louis Regional Office was not informed of the application or approval of the water line extension diagram by the central office in Jefferson City.

On July 13, 1977, the Schebles filed for record in Jefferson County, a document entitled "Additional Restrictions For Wood View Acres Addition." The document established certain restrictive covenants concerning the use and maintenance of the pond which borders some of the property owned by the Schebles. (See upper right corner of the appendix). The restrictions applied to all prospective owners of the lots platted by Eade (Tract E), including the "outlot." The owners of the lots in the northern tract of property (Tract F) became subject to the additional restrictions through the execution of quitclaim deeds.

As of the date of the hearing before the Commission, the Schebles had sold a total of eleven lots in the Wood View Acres development. Ten of those lots, including the "outlot," have residences on them. The Schebles still own five lots, four of which are undeveloped. Every lot owned or formerly owned by the Schebles, upon which a residential dwelling has been constructed, is serviced by a single-family dwelling mechanical aeration waste water treatment facility. The Schebles never submitted to DNR an engineering report concerning waste water treatment.

On June 2, 1982, DNR filed an abatement complaint before the Commission against John and Mary Scheble. The complaint averred that the Schebles were and had been violating the Missouri Clean Water Law, §§ 204.006 through 204.141, RSMo (1978) (all further references shall be to RSMo 1978 unless otherwise noted), and its attendant regulations, 10 C.S.R. Division 20. DNR alleged that the Schebles had subdivided sixteen lots for the development of a subdivision; that eleven of the lots had been sold by the Schebles and ten residences had been built thereon; that prior to the sale of any lot or the commencement of construction on any lot the Schebles did not submit an engineering report for waste water treatment to DNR for its written approval; that of the ten lots developed the Schebles installed or permitted to be installed single-family dwelling waste water treatment facilities with dispersal lines and outfall points appurtenant thereto at locations less than twenty-five feet from the nearest property line. It was further alleged that effluent from the waste water treatment facilities was not contained within the lots upon which the facilities were installed and was reasonably certain to enter the creek that flowed through the subdivision; that as a result the Schebles had permitted water contaminants to be placed in a location where they are reasonably certain to cause pollution of the waters of the State of Missouri. DNR prayed that the Commission enter an abatement order against the Schebles requiring them to submit plans for the connection of residences to the Lower Big River Sewer District by means of trunk sewers constructed on tracts D, E, and F, and to make formal application therefor. DNR prayed further that the Schebles be required to bear the financial burden for the construction of the sewer lines. In the event the Sewer District denied their application, DNR prayed

that the Schebles be required to construct an independent sewer system for the development.

The events leading up to the filing of the abatement complaint involved an ongoing investigation by DNR. DNR's involvement in Wood View Acres began on June 10, 1976. Robert Zeman, an engineer for DNR, visited the area in response to a report he received from Ralph Ross, Chairman of the Lower Big River Sewer District, that a subdivision was under development there. Mr. Zeman found that L.K. Wood was in the process of constructing a subdivision without the approval of DNR as to waste water treatment facilities. After a series of letters and telephone calls between Zeman, L.K. Wood, Sr., Danny Gardner of Gardner Planning & Construction, Inc., and Don McCutchen, an engineer retained by L.K. Wood & Gardner, DNR conditionally approved waste water treatment plants to be used at 13 lots being developed by L.K. Wood and Gardner. DNR approved a mechanical aeration treatment plant with the use of either of two effluent dispersal systems; a conventional soil absorption field or an elevated evapotranspiration mound. The approval was conditioned upon L.K. Wood's agreement "to guarantee the operation of each of the thirteen facilities and to make any alternatives [sic] or corrections necessary to prevent effluent discharge of the individual lots, should such work be necessary within a five year period ending December 31, 1981," and upon the facilities being designed "so as not to create violations of the Missouri Clean Water Law and regulations."

The first recorded contact that DNR had with the Schebles was on April 21, 1980. Mr. Donald Boos, an environmental specialist with DNR, made the initial contact during an investigation of the lots in the L.K. Wood development. None of the Scheble lots contained in tracts D, E, and F were investigated at this time. Indeed, although Zeman and Boos and other DNR employees had visited the Wood Acres Development on December 28, 1978; June 6, 1979; and October 12, 1979; Zeman testified that during this entire period the St. Louis Regional Office Water Pollution Section was not aware that the Schebles were the developers of tracts D, E, and F. Zeman testified that the entire subdivision appeared to be connected to L.K. Wood and that even though he maintained constant contact with Mr. L.K. Wood, Sr., it was not until the fall of 1981 that he found out that the Schebles were the developers.

It was during three days in the fall of 1981 that Zeman returned to Wood View Acres to conduct a thorough investigation of the entire area. On those three days, September 24, October 5, and October 8, he testified that he observed what appeared to be sewage effluent flowing from discharge pipes of sewage treatment facilities off of lots sold and/or developed by the Schebles. The Schebles had personally constructed four of the homes on tracts D, E, and F. In a letter dated October 5, 1981 the DNR cited the Schebles for an alleged violation of the Clean Water Law.

On May 28, 1981, prior to being cited, Mary Scheble telephoned a complaint to the DNR. Mrs. Scheble called to complain about an individual home sewage treatment facility that was discharging directly into the pond located at the southeast corner of tract F. She was concerned about contamination of the pond because her children used it for swimming. The discharge from a pipe connected to the individual home sewage treatment facility located at 3626 Scheble Drive (the middle two lots in Tract F). Mrs. Scheble also objected to an overflow pipe that Kenneth Smith had connected to his individual disposal facility at 3641 Scheble Drive (the lot labeled "outlot" in Tract E). Mrs. Scheble testified that Smith had an overflow pipe installed, at the Schebles expense, that was going to discharge onto a vacant lot (lot # 1 in Tract E) owned by the Schebles. She testified that the pipe was shortened at her request and that it was "cut back just so it would be on the other side of the property line." She testified further that the discharge from the pipe flows toward lot # 1.

Zeman again visited Wood View Acres on September 1, 1982. This time he collected samples of what appeared to be sewage

effluent to be analyzed for fecal coliform bacteria. Some of the samples were taken from discharge pipes located on individual lots in tracts D and E, others were taken from points in the creek or "ditches" in the Scheble development. Zeman testified that he collected the samples "using sterile bottles provided specifically for fecal coliform analysis" by the DNR laboratory in Jefferson City. Zeman stated that he filled each bottle with a quantity of liquid at the point of collection; he then tightly capped the bottle and tagged it with an identifying number showing where the sample was taken. The samples were then placed in an ice chest for preservation and shipped to the laboratory in Jefferson City. Zeman testified that the method in which he took the samples was a standard and accepted method. The samples were taken to be tested for fecal coliform, Zeman said, because if it is present it indicates pollution by human waste and the assumption can be made that other organisms, bacteria, or viruses that are harmful can also be present.

The fecal coliform samples were transported to Jefferson City where they were analyzed in the DNR lab by Mary Weeks. A chain of custody form (DNR Exhibit 70) was filled out by Zeman as the collector of the samples. The form shows that the samples were received by Douglas Lind, an assistant attorney general and the attorney representing the state in this matter. Zeman testified that he had turned the ice chest and the samples contained therein over to Lind for transportation to Jefferson City. The chain of custody form shows that this transaction took place at 3:30 p.m. on September 1, 1982. Both Zeman and Lind signed the form. Mr. Lind stated on the record, after being asked by the hearing commissioner, that he received the samples on September 1, 1982 at 3:30 p.m. Mary Weeks, the last person in the chain of custody, testified that she personally received the samples listed on the form from Douglas Lind and that she personally signed the form. She testified that she received the samples on September 1, 1982 at 6:08 p.m. This also is reflected on the chain of custody form.

Mary Weeks testified that she performed a bacteriological analysis for fecal coliform on the samples. She testified as to the method of analysis and the procedures therefor. The results showed that the samples had been contaminated by fecal coliform. The results of her analysis were as follows:

| Sample No. | Selected Value Colonies/100 ml. |
|---|---|
| 82–9521 | 2,600,000 col./100 ml. |
| 82–9522 | 79,000 col./100 ml. |
| 82–9523 | 4,400 col./100 ml. |
| 82–9529 | 790,000 col./100 ml. |

As to the points where the samples were collected, Zeman located them on DNR Exhibit 28B. Sample Nos. 82–9521, 82–9522, and 82–9523 were collected from discharge pipes in tracts D and E of the incorporated diagram. Sample No. 82–9529 was collected from the intermittent creek flowing through tract D.

Exhibit 28B represents the entire Wood View Acres subdivision. Zeman testified that he had "traced" the Exhibit "directly from the record plats in the recorder's office [of Jefferson County] which were one inch to one hundred feet scale," and that all boundary lines were "as per the official records." He testified further that he located all objects marked on the Exhibit by "direct observation" and that they were placed "exactly where they are located."

Dr. James Hadley Williams, Chief of the Engineering Geology Section of DNR's Division of Geology and Land Survey, testified that he conducted a geologic site investigation of Wood View Acres, including tracts D, E, and F of the Scheble development, on October 13, 1982. Dr. Williams had conducted a similar investigation in 1976, but at that did not consider Scheble's development, i.e. tracts D, E, and F. Dr. Williams' written report on the 1982 inspection concluded that the geologic limitations in the entire area were "severe" regarding the use of single-family dwelling waste water treatment facilities. Dr. Williams stated that from a geological aspect nothing, presumably short of central sewers, could be done presently to prevent the surface water runoff from one lot to another. Dr. Williams was of the opinion that the soil

absorption fields in the area cannot effectively contain sewage effluent. The Commission found Dr. Williams "to be an extremely credible, honest, and forthright witness and note[d] that no credible evidence was introduced ... in contradiction to [the] 1982 report and testimony at trial."

The Commission specifically found the testimony of Robert Zeman and Donald Boos to be credible. And, the Commission found "as a matter of fact in favor of said witnesses" to the extent their testimony conflicted with that of other witnesses.

In its Conclusions of Law the Commission stated that "John and Mary Scheble have caused pollution of the waters of the State of Missouri or placed, caused, or permitted to be placed a water contaminant in locations where it is reasonably certain to cause pollution of waters of the State of Missouri." The Commission concluded that the Schebles had violated § 204.076.1 by subdividing sixteen lots in the Wood View Acres area without first filing an engineering report and receiving approval thereof from DNR. In order to correct the pollution caused by the alleged violations, the Commission ordered John and Mary Scheble to submit a formal application to the Lower Big River Sewer District to provide sewer service to the Wood View Acres subdivision. The Commission concluded that connection with said Sewer District is the most feasible and best solution to the water pollution found to exist in Wood View Acres. The Schebles were further ordered to submit documentation to DNR showing that a formal application has been filed with the Sewer District and assurance that the appropriate financial burden of trunk line construction and sewer construction will be borne by John and Mary Scheble. The Commission ordered that the sewers be completed within 120 days of the issuance of a construction permit by the DNR. In the event that the Lower Big River Sewer District refused to offer sewer service to Wood View Acres, the Commission ordered the Schebles to construct an independent centralized sewage collection and treatment system.

The polluted condition of Wood View Acres is what the Commission sought to rectify in its administrative order at issue on appeal. We review the decision of the Commission as if it had been directly appealed to this court. *Fujita v. Jeffries*, 714 S.W.2d 202, 204 (Mo.App.1986). Although we review the Commission's decision and not that of the circuit court, by necessity when the circuit court invalidates the Commission's order and an appeal follows, the points raised on appeal are directed to the decision of the circuit court. Therefore, we review those points raised on appeal.

The standard of review of an administrative contested case at both the circuit court and appellate court level was well expressed in *Phipps v. School District of Kansas City*, 645 S.W.2d 91 (Mo.App.1982):

The statutes, rules and precedents which define and measure the role of the circuit court on review of an administrative contested case codefine and comeasure the role of the appeals court. Thus, neither the circuit court under § 536.-140.1 nor the court of appeals from the judgment of the circuit court reviews *de novo* [*Michler v. Krey Packing Co.*, 363 Mo. 707, 253 S.W.2d 136, 141[5–7] (banc 1952)]; rather, each reviews the decision of the agency [*Edmonds v. McNeal*, 596 S.W.2d 403, 407[1] (Mo. banc 1980); *Moran v. Whaley*, 608 S.W.2d 446, 448[3, 4] (Mo.App.1980)], each defers to the administrative adjudication [*McCallister v. Priest*, 422 S.W.2d 650, 658[7–11] (Mo. banc 1968)] and each must sustain the agency decision unless the contestant by cogent evidence proves that the determination does not rest on competent and substantial evidence or is otherwise not valid [*Marshfield Community Bank v. State Banking Board*, 496 S.W.2d 17, 26[19–26] (Mo.App.1973); *Johnson v. Watkins*, 298 S.W.2d 535, 538[2, 3] (Mo. App.1957)].

*Id.* at 95.

■ Because the Commission's action in the instant case involves questions of law, questions of fact, and administrative discretion, the scope of our inquiry is tripartite. Questions of law are matters for the inde-

pendent judgment of the court. *Wolf v. Missouri State Training School for Boys*, 517 S.W.2d 138, 142 (Mo. banc 1974). "[T]here is no discretion lodged in the administrative body that in anyway restricts or limits the right and duty of the court to interpret the law applicable to the case before it." *Gilmore v. Thompson*, 413 S.W.2d 20, 22 (Mo.App.1967) (citations omitted). However, when the application of the law to the facts is the only administrative action in question, the "court may weigh the evidence for itself and determine the facts accordingly...." *Bergman v. Board of Trustees of Firemen's Retirement System of St. Louis*, 425 S.W.2d 143, 147 (Mo.1968) (quoting § 536.140.3, RSMo (1959) governing appellate review of administrative decisions. The statutory wording is identical to § 536.140.3, RSMo (1978) which was controlling at the time this case was decided). Of course, when undertaking this type of *de novo* review, we must defer to the administrative body's findings involving the credibility of witnesses and to administrative expertise, *Bergman*, 425 S.W.2d at 146–47, and "if the evidence permits either of two opposed findings, we should accept the findings of the administrative body." *Fleming Foods of Missouri, Inc. v. Runyan*, 634 S.W.2d 183, 192 (Mo. banc 1982). When the administrative action under review involves the exercise of administrative discretion in light of the facts, our inquiry is limited to a determination of whether the action was: (1) in violation of the United States or Missouri constitutions; (2) ultra vires; (3) unsupported by competent and substantial evidence upon the whole record; (4) unauthorized by law; (5) made without lawful procedure or a fair trial; (6) arbitrary or capricious; or (7) an abuse of discretion. § 536.140.2; *Wirtz v. Civil Service Commission of St. Louis County*, 646 S.W.2d 384, 385 (Mo.App. 1983).

In their first point, appellants maintain that the circuit court erred in reversing the decision of the Commission on evidentiary grounds. Appellants argue that the Commission's decision was supported by competent and substantial evidence and that the evidence established: (1) that the Schebles

are "developers" within the meaning of the Clean Water Law; (2) that the Schebles violated the Clean Water Law because as "developers," they failed to file an engineering report dealing with the disposal of waste water and did not receive DNR's approval prior to or even after commencing the development of their sixteen lot subdivision; and (3) that the Schebles caused the pollution of the waters of the State of Missouri, or placed, caused or permitted to be placed a water containment in locations reasonably certain to cause pollution, in that they caused or permitted single-family dwelling waste water treatment facilities to be constructed in their subdivision in such a manner so as to cause affluent from water containment or point sources to be discharged directly or indirectly into the pond adjacent to and the intermittent creek that flows through the subdivision. Appellants also argue that the circuit court erred in holding that certain exhibits and testimony were improperly admitted. We address appellants' argument in seriatim.

Under § 204.051.1(1) of the Missouri Clean Water Law, it is unlawful for any person "[t]o cause pollution of any waters of the state or to place or cause or permit to be placed any water contaminant in a location where it is reasonably certain to cause pollution of any waters of the state." The law also prohibits any person from causing or permitting "any discharge of water contaminants from any water contaminant or point source located in Missouri in violation of [the Clean Water Law], or any standard, rule or regulation promulgated by the [clean water] commission." § 204.076.1.

The following definitions provide further explanation of the violations set forth in §§ 204.051.1(1) and 204.076.1:

"Discharge", the causing or permitting of one or more water contaminants to enter the waters of the state;

"Point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or ves-

sel or other floating craft, from which pollutants are or may be discharged;

"Pollution", such contamination or other alteration of the physical, chemical or biological properties of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge or any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is reasonably certain to create a nuisance or render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, industrial, agricultural, recreational, or other legitimate beneficial uses, or to wild animals, birds, fish or other aquatic life;

"Water contaminant", any particulate matter or solid matter or liquid or any gas or vapor or any combination thereof, or any temperature change which is in or enters any waters of the state either directly or indirectly by surface runoff, by sewer, by subsurface seepage or otherwise, which causes or would cause pollution upon entering waters of the state, or which violates or exceeds any of the standards, regulations or limitations set forth in sections 204.006 to 204.141 or any federal water pollution control act, or is included in the definition of pollutant in such federal act;

"Water contaminant source", the point or points of discharge from a single tract of property on which is located any installation, operation or condition which includes any point source defined in sections 204.006 to 204.141 and nonpoint source under any federal water pollution control act, which causes or permits a water contaminant therefrom to enter waters of the state either directly or indirectly;

"Waters of the state", all rivers, streams, lakes and other bodies of surface and subsurface water lying within or forming a part of the boundaries of the state which are not entirely confined and located completely upon lands owned, leased or otherwise controlled by a single person or by two or more persons jointly or as tenants in common and includes waters of the United States lying within the state.

§ 204.016.

Pursuant to § 204.026(8), the Commission is empowered to promulgate regulations to enforce, implement, and effectuate the Clean Water Law. In accordance with this authority, the Commission lawfully adopted 10 C.S.R. § 20–6.030 (1975), controlling at the time Schebles purchased their property and developed it. § 20–6.030 sets forth the rules and procedures that "developers" must follow regarding the disposal of waste water in subdivisions.

A "developer" is defined by the regulations as "any person who, directly or indirectly sells or leases ... any lots in a subdivision." 10 C.S.R. § 20–2.010(9) (1974). "Developer" is further defined as "any person who subdivides, owns or controls land as set forth in subsection (1)(B) of this rule." 10 C.S.R. § 20–6.030(1)(A) 2 (1975). Subsection (1)(B) provides that:

[u]nless specifically provided otherwise of this rule, this regulation shall apply to any developer who:

1. develops or divides land into a subdivision, or constructs dwellings which constitute a subdivision; or

2. resubdivides land into more lots, adds additional lots to, or constructs additional dwellings in an existing subdivision; or

3. resubdivides land into more lots, adds additional lots to, or constructs additional dwellings which, when added to an existing group of lots or dwellings which are contiguous, or which are known, designated, or advertised as a common unit or by a common name, will in total constitute a subdivision; or

4. owns or controls at least any ten (10) lots or dwellings in an existing subdivision.

10 C.S.R. § 20–6.030(1)(B) (1975).

A "subdivision," as defined in the regulations promulgated under the Clean Water Law, is:

any land which is divided or proposed to be divided into ten (10) or more lots, whether contiguous or not, for the purpose of sale or lease or rental or the

construction of dwelling on lots as part of a common promotional plan; and where subdivided land is offered for sale or lease, or where dwellings are constructed by a single developer or a group of developers acting in concert and where such lots or land or dwellings are contiguous or is [sic] known, designated, or advertised as a common unit or by a common name, such lots or land and dwellings shall be presumed, without regard to the number of lots or dwellings covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.

10 C.S.R. § 20–6.030(1)(A) 3 (1975). *Accord*, 10 C.S.R. § 20–2.010(40) (1974).

Before a developer can commence construction on any lot within the new development, or sell, rent, or lease any lot, he must first submit to DNR a report prepared by an engineer, outlining his plans for the disposal of waste water. 10 C.S.R. § 20–6.030(3)(A) (1975). The developer must obtain the written approval of the plan from DNR and comply with all conditions and requirements set forth in writing by DNR before the development can proceed. 10 C.S.R. § 20–6.030(4)(A) (1975). It is unlawful for any developer to deviate significantly from the proposed methods of waste water disposal contained in an engineering report approved by DNR without first receiving written approval. 10 C.S.R. § 20–6.030(4)(B) (1975).

■ We conclude that substantial and competent evidence amply established that the Schebles violated the Missouri Clean Water Law. It is clear that the Schebles were "developers" of a "subdivision" as those terms are defined by the regulations. They developed and divided land into ten or more lots for the purpose of sale or lease or rental or the construction of dwellings on the lots as part of a common promotional plan. In this case it is irrelevant that they segmented their development activity. The evidence shows that Schebles purchased four contiguous tracts of land during the period of 1974 through 1977. In the Spring of 1977 they contacted Metropolitan Engineering to have survey work

done on their properties. The preliminary drawing, prepared by Robert Eade of Metropolitan, shows the development of a subdivision with thirteen numbered lots. The final plat of the Scheble development filed with the recorder of deeds evinces land subdivided into ten lots. (Tract E). That one lot was labeled "outlot" is of no consequence. "Outlot" is not a magic name that can transform a division of land into ten lots into that of a division of nine.

Moreover, it is apparent that Scheble's development of tracts D, E, and F was part of a common promotional scheme. In June of 1977, Metropolitan prepared a water line extension diagram covering all three tracts. It contemplated the connection of sixteen lots to the water line. The Schebles have, in fact, sold lots in all three tracts. There is only one means of ingress to and egress from the three tracts. Moreover, the Schebles desired and were successful in getting all of tracts D, E, and F subjected to the deed of restrictions to Wood View Acres; restrictions which pertained to the development of a residential subdivision. The nature of development and the sequence of events leading thereto, clearly demonstrate that the Schebles are "developers" and that their activities in Wood View Acres constitute the development of a "subdivision." Thus, Schebles' activities brought them within the purview of the Clean Water Law.

It is true that the Schebles filed a water line extension plan with the DNR office in Jefferson City. However, they did not file an engineer's report outlining plans for the disposal of waste water as required by 10 C.S.R. § 20–6.030(3)(A). Hence, DNR never approved any plans of the Schebles, nor did DNR have any opportunity to study the same. If plans had been submitted prior to development, DNR might have required a central sewer system of the Schebles in the first place.

■ The record reveals substantial and competent evidence showing that Schebles have violated §§ 204.076.1 and 204.051.1(1) of the Missouri Clean Water Law. As previously noted § 204.076.1 makes it unlawful for any person to cause or permit "any

discharge of water containments from any water containment or point source located in Missouri in violation of [the Clean Water Law], or any standard rule or regulation promulgated by the Commission." § 204.-051.1(1) declares it is unlawful for any person "to place or cause or permit to be placed any water contaminant in a location where it is reasonably certain to cause pollution of any waters of the state."

Robert Zeman and Donald Boos testified about having observed single-family dwelling waste water treatment facilities, discharge pipes, and ditches in the Scheble subdivision discharging or serving as conduits for partially treated sewage. On September 1, 1982, Zeman collected samples to be tested for fecal coliform, an indicator of pollution, from three lots in the Scheble subdivision.

John Scheble testified that he had constructed homes on lots known as 3671 Scheble Drive and 3661 Scheble Drive. Mr. Scheble testified that he hired the subcontractor who installed the individual home sewage treatment system at 3671 Scheble Drive. Robert Zeman testified that he collected fecal coliform samples on September 1, 1982 from the two aforementioned lots and from points in the nearby creek. Clean Water Law regulations 10 C.S.R. 20-7.-015(3)(B) 3 establishes fecal coliform limitations. Samples collected by Zeman from the subdivision developed by the Schebles showed fecal coliform levels far in excess of those permissible.

Clearly, the definition of "point source" set forth in § 204.016 includes those discharge pipes from which Zeman collected his samples in the Scheble subdivision. The definition includes any "pipe ... from which pollutants are or may be discharged." Zeman testified that waste water had been observed emanating from those discharge pipes. The samples Zeman took were tested and were clearly proven to be "water contaminants" because they "violate[d] or exceed[ed] ... one of the [commission's] regulations." *See* § 204.-016(12). The samples taken from the discharge pipes showed fecal coliform levels far in excess of the permissible state levels.

Furthermore, there was testimony that effluent from discharge pipes was being pumped directly into the pond and flowing through the intermittent creek in the Scheble development. Samples were taken by Zeman from the creek which showed the presence of fecal coliform in excess of permissible levels. Under § 204.016(12) the samples were "water contaminants," and as such they were also "pollution" as defined in § 204.016(7). Zeman testified that the presence of fecal coliform indicates the presence of other harmful bacteria that could injure the public safety. Additionally, it is clear that the pond and intermittent creek are "waters of the state" as defined in § 204.016(15) and 10 C.S.R. § 20-2.-010(45) (1974). From the testimony presented at the hearing, it is undisputed that the intermittent creek that passes through the Scheble development has a natural flow of its own during times of significant rainfall. During those times the pond will overflow causing the creek to fill and flow into the Big River. In *Hammack v. Missouri Clean Water Commission,* 659 S.W.2d 595 (Mo.App.1983), it was held that "waters of the state" includes all waterways and "unnamed tributar[ies] which flow at least during times of significant rainfall, even though the tributary [is] not continuously discharging water into a navigable river at the time of unlawful discharge...." *Id.* at 599. We conclude that the evidence clearly and convincingly showed that water contaminants were being discharged into the waters of the state from single-family dwelling waste water treatment facilities in the subdivision which the Schebles developed.

■ The circuit court reached the opposite conclusion because it found that some of the evidence relied on by the Commission was inadmissible. The circuit court found DNR maps, Exhibits 28A and 28B, inadmissible because they were assembled by "inaccurate means." The maps, demonstrative in nature, were used to show the entire development and violations therein. Zeman, a registered professional engineer, testified that the maps were drawn to scale by tracing all street and lot

lines from the official plats recorded in the Jefferson County Recorder's Office. He testified that he located all other objects marked on the exhibits by "direct observation" and that they were placed "exactly where they were located." Zeman had marked on Exhibit 28B the locations where he had collected the fecal coliform samples. He testified that the markings fairly and accurately represent the locations where the samples were taken. We conclude that these maps were properly admitted as perceptual aids for the Commission, the trier of fact.

Generally, the use of maps, diagrams and charts may be used to communicate complicated or confusing information to the trier of fact. *See Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 643 (Mo.App. 1980). It is clear that the map Exhibits only served to make Zeman's oral testimony more easily understood. DNR had alleged that the Schebles had permitted dispersal lines from waste water treatment facilities to be placed at locations less than twenty-five feet from the nearest property line. Because no precise measurements were presented to the Commission, via the maps or testimony, no finding was made as to this allegation.

■ The other evidence held improperly admitted by the circuit court was the samples collected by Zeman and the results of the tests performed thereon. The circuit court held DNR Exhibit 70, showing the chain of custody of the samples, was defective. We disagree. The chain of custody doctrine as a principle of proof does not require an account for " '[the] hand to hand custody of the evidence from the time it is obtained to the time it is admitted into evidence, nor does it need to be continually watched.' " *Storm v. Ford Motor Company*, 526 S.W.2d 875, 878 (Mo.App.1975) (quoting *State v. Day*, 506 S.W.2d 497, 502 (Mo.App.1974)). Chain of custody is sufficiently traced where circumstances demonstrate a reasonable assurance that the object proffered into evidence is the same object and in the same condition as of the time it was obtained. *Id.* Of course, a complete chain of custody must trace the

possession of the object sought to be admitted, and if one link in the chain is missing, the object cannot be received. *Wehrkamp v. Watkins Motor Lines, Inc.*, 436 S.W.2d 698, 712 (Mo.1969). The court's sole concern, however, is that the evidence in the case under review provides "reasonable assurance" that the exhibits in question were not altered or substituted prior to analysis or trial. *State v. Turnbough*, 729 S.W.2d 37, 40 (Mo.App.1987). It is not essential that every link in the chain testify. *Id.* at 41.

■ Here, the testimony adduced at trial provided the reasonable assurance necessary for the admission of Exhibit 70 into evidence. It matters not that Douglas Lind, the middle link in a three link chain, did not testify. All links in the chain were identified. Robert Zeman testified that he collected the fecal coliform samples and filled out Exhibit 70, the chain of custody form. He testified that he signed the form and turned it and the samples over to Douglas Lind, the attorney for the state in this matter. The form shows that the samples were received by Douglas Lind. Douglas Lind's signature appears on the form. The identity doctrine is sufficient to link Douglas Lind with the form and the samples. "It has long been held in Missouri that identity of names is prima facie evidence of the identity of person." *State v. McKinney*, 718 S.W.2d 583, 586 (Mo. App.1986). Mary Weeks, the last link in the chain, testified that she personally received the samples as identified on the form and that she received them from Douglas Lind. No reasonable doubt existed regarding the identity of the samples received and tested by Mary Weeks. Her testimony fully corresponded with Zeman's as to the appearance of the samples, their containers, and the ice chest in which they were transported. We conclude, therefore, that DNR Exhibit 70 and the laboratory results of the tests conducted upon the samples were admissible.

■ Having concluded that the evidence relied on by the Commission is competent, i.e. admissible, and substantially establishes the discharge of water contaminants

from discharge pipes located in the Scheble subdivision, we still must determine, under §§ 204.051.1 and 204.076.1, whether the Schebles "permitted" the discharge.

The circuit court ruled that the Commission had to be reversed because there was no evidence showing that the Schebles personally placed discharge pipes on any lot. The Clean Water Law does not require such a showing for liability to attach. Here, the Schebles subdivided sixteen lots to sell and did sell them as residential property. The Schebles did not file an engineering report with the DNR detailing proposed waste water disposal as required by the Commission's regulations. This is no mere technical violation, but a substantial one. It has resulted in the pollution of the waters of this state. But for the unapproved Scheble subdivision there would be no waste water flowing therefrom. Thus, it is clear, that the Schebles permitted discharge.

In their second point, appellants contend that the circuit court erred in reversing the Commission's decision on remedial grounds. The appellants argue that the Commission is entrusted with the enforcement of the Clean Water Law and may issue any order appropriate under the circumstances.

■■■ The underlying purposes of the Missouri Clean Water Law are, as declared by the legislature, to insure high water quality, and minimum degradation of the waters of this state; to conserve the waters of the state; to provide that no waste be discharged into any waters of the state without first receiving the necessary treatment or other corrective action; and to provide for the prevention, abatement, and control of new or existing water pollution. § 204.011; *Curdt v. Missouri Clean Water Commission*, 586 S.W.2d 58, 59 (Mo.App. 1979). The Missouri Clean Water Commission is the administrative agency charged with administering and enforcing the goals of this law. §§ 204.021 and 204.026. Like other administrative agencies, the Commission is possessed of only those powers that the legislature has deemed provident to confer. *Curdt*, 586 S.W.2d at 59. The

powers imparted by the legislature may be expressly or impliedly conferred by the statute. *Id.* Implication of a power, however, is only proper if it necessarily follows from the language of the statute. *Brooks v. Pool-Leffler*, 636 S.W.2d 113, 119 (Mo. App.1982). Remedial legislation, such as the Clean Water Law, should be broadly and liberally construed to effect its plain purpose. *Id.* at 117–18.

■■■ The statutory provisions of the Clean Water Law do not explicitly grant the Commission the power to compel a developer who is in violation of the law to connect to or install a centralized sewer system. However, after a careful examination of the statute in pari materia, we find that the Commission possesses the implied authority to issue a mandatory injunction of the type at issue here. The plain language of the statute renders this conclusion inescapable.

In § 204.056.6 the legislature empowered the Commission, after due consideration of the record of a hearing, to "issue and enter such final order ... as it deems appropriate under the circumstances" to abate pollution of the waters of the state. This grant of administrative power is sufficiently broad to encompass the remedy ordered by the Commission in the instant case.

Here, the Commission issued two alternative orders based on its conclusion that connection with a centralized sewer system is the most feasible and best solution to the water pollution found existing in the Scheble development. By the first alternative, the Commission ordered the Schebles: (1) to apply to the Lower Big River Sewer District to provide sewer service to Wood View Acres; (2) to submit documentation to DNR showing that application has been made and showing a proposed schedule for the development of plans and specifications for said sewer service; (3) to provide DNR assurance that the appropriate financial burden of sewer construction would be borne by them; (4) to submit to DNR a complete application for a construction permit; and (5) to submit to DNR within 120 days of the day of the issuance of the construction permit, documentation show-

ing that the construction of said sewer system is completed and that sewers are available to each dwelling within the subdivision.

The second alternative ordered by the Commission was contingent upon the Lower Big River Sewer District's denial of Schebles' application for connection to its centralized sewer system. In the event the Sewer District denied sewer service to the residents of the development, the Schebles were ordered to construct an independent centralized sewage collection and treatment system.

Clearly, the statutory provisions of the Clean Water Law impliedly grant the Commission the power to order the remedy at issue here. It has been determined that the Schebles have violated the Clean Water Law by failing to file an engineering report with DNR and that they are responsible for pollution in the Wood View Acres area. The Commission has found that connection with a centralized sewer system is the best solution to the pollution problem created by the Schebles. The remedy ordered by the Commission would facilitate the policies declared by the legislature in enacting the Clean Water Law. It would insure high water quality, prevent the discharge of waste water that has not been properly treated, and it would abate existing water pollution. Undoubtedly, the power to order the remedy at issue, so consistent with the purposes of the law, was impliedly granted by the legislature in § 204.056.6.

The appellants argue further that the trial court erred in reversing on remedial grounds because the remedy ordered by the Commission: (1) does not involve an unconstitutionally retroactive application of law; (2) is not punitive in nature; (3) does not rest upon improper application of geologic standards; (4) is not impossible or unenforceable; (5) is not excessive even though Schebles complied with the requirements of the Jefferson County Building Commission; (6) does not erroneously rest upon the conclusion that the Scheble subdivision is a new rather than an existing development subdivision.

■ The circuit court found the Commission's order constitutionally defective because it is retroactive in effect and abrogates the Scheble's substantial and vested rights. Article I, Section 13 provides that "no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, ... can be enacted." It is crucial to remember that the proscription against retroactive laws contained in Article I, Section 13 applies only to legislative enactments rather than to judicial decrees and judgments. See In Re Marriage of Simpelo, 542 S.W.2d 558, 560 (Mo.App. 1976). It should be noted that the circuit court found the remedy ordered by the Commission retroactive in effect and not any legislative enactment under which the Commission exercised its power. Here, the Commission issued its order in an adjudicatory capacity.

■ Moreover, we have searched in vain to find what law it applied retroactively. The Clean Water Law and the subdivision regulations, applied by the Commission, were respectively enacted by the legislature and the Commission in 1972 and 1975. Both were in effect at the time the Scheble developed their subdivision in violation thereof. The Commission has not changed any law, either created by rule making or adjudication, that it has previously declared. Therefore, we find no basis for this ground of the circuit court's ruling.

■ The circuit court found that the Commission's order was infirm and subject to reversal because it is punitive in nature. As previously noted, the Clean Water Law expresses a broad, pervasive legislative intent to prevent water pollution. State ex rel. Ashcroft v. Union Electric Co., 559 S.W.2d 216, 221 (Mo.App.1977). Statutes enacted for the protection of life and property, or which introduce some new regulation conducive to the public good, are considered remedial in nature. State ex rel. Dresser v. Ruddy, 592 S.W.2d 789, 794 (Mo. banc 1980). In Ruddy, the court concluded that the Clean Water Law was both remedial and penal in nature. It was considered penal insofar as specified penalties

are provided for violations. *See* § 204.076.1. The court noted, however, that when a statute is both remedial and penal, it should be considered a remedial statute when enforcement of the remedy is sought and penal only when the enforcement of the penalty is sought. *Id.* The penalty provided for by § 204.076.1 is the assessment of a fine not to exceed ten thousand dollars per day for each day the violation occurred and continues to occur. Here, the DNR did not seek, nor did the Commission impose the statutory penalty. Rather, by its order the Commission sought to abate the pollution of Wood View Acres. Clearly, such an order is remedial in nature. It serves to protect the health and welfare of the public. It is not a private punishment. Thus, we conclude that this ground cannot serve to reverse the Commission's order.

The circuit court also found that the remedy ordered by the Commission was in excess of its authority because it had allowed the Scheble development to be judged by two different geological standards. The circuit court refers to Dr. Hadley Williams' testimony about the two geological surveys that he conducted; the one in 1976 and the one in 1982. It is clear from Dr. Williams' testimony, however, that the 1976 survey did not consider the Scheble development. The 1982 investigation was the first time Hadley considered the geologic suitability of the Scheble subdivision for individual home sewage treatment facilities. Thus, only one geologic study pertained to the Schebles. Moreover, a careful examination of the Commission's finding, conclusions, and order reveals nothing about a judgment concerning geologic standards. The Schebles were not deemed to have violated any geologic regulations or standards. Rather, it appears that Dr. Williams' expert testimony was part of the evidence put on by DNR concerning the pollution problems in the subdivision, and how they could be corrected. Hence, there was no ground for the circuit court to reverse on this basis.

Next, the circuit court found that the Commission's order was subject to reversal because the remedy ordered was impossible to enforce. The first remedy ordered by the Commission, connection to the Lower Big River Sewer District, is certainly possible. We are well aware that as of the time of the hearing the Schebles no longer have any title or interest in eleven of the sixteen lots in their development. However, the Commission has not, in the first alternative, ordered the Schebles to commit a trespass, reenter upon land, or claim an easement that does not exist. Rather, the Commission ordered the Schebles to apply to the Lower Big River Sewer District to be allowed to connect their development thereto. If the District approves the application, the Schebles must assure that they will carry the financial burden of installation of the system, provide a proposed schedule for the development of plans and specification, and apply to the DNR for a construction permit. The order does not mandate that the Schebles reenter the lots already sold and construct the system themselves. Instead, within 120 days of the issuance of the construction permit, they must submit documentation that the construction of sewers is completed.

The Commission observed that no credible evidence was presented "to cause it to believe that the residents [of the Scheble development] would not be more than happy to accept central sewer treatment facilities if such would be offered without cost to them and at a reasonable monthly charge." Under the first alternative, if the residents do protest the installation of the system after the Sewer District has approved connection, the Sewer District has the power to condemn any land necessary for connection with the sewer and treatment system of the District. *See* §§ 204.340, RSMo (1986) and 249.540, RSMo (1986). Of course, under the Commission's order the Schebles would be responsible for any costs associated with the condemnation. *See* §§ 204.360(2), RSMo (1986) and 250.050(3), RSMo (1986).

Under the second alternative, if the District refuses to allow connection to its system, the Schebles are ordered by the Commission to construct and complete an inde-

pendent centralized sewage collection and treatment system. Obviously, the Schebles do not possess the power of eminent domain. However, the Commission, in its conclusions of law, set forth a course of action that could be followed in the event any resident refused to accept such sewer service. The Commission noted that in such event DNR could proceed against any such resident who did not accept service at that time. We agree.

When a developer proceeds in building a subdivision in violation of the Clean Water Law, he does so at his own peril. "To allow [the Schebles] to avoid liability by delegating responsibility for the operation and maintenance of [the] treatment facilit[ies] to third parties would frustrate the purpose and limit the effectiveness of the Missouri Clean Water Law." *State ex rel. Ashcroft v. Mathias*, 616 S.W.2d 882, 885 (Mo.App.1981).

Under 10 C.S.R. 20–6.030(1)(D) (1984), "[i]f [DNR] determines that there is a violation of the Missouri Clean Water Law and regulations, any developer(s), owner(s), or person(s) controlling any single-family residence waste water facilities on or after the effective date of this regulation, whether then in existence or installed after the effective date of this regulation, shall eliminate such facility." Clearly, if a violation does exist, and the use of such facilities is required to be eliminated, DNR can require elimination on all lots, by the owner or occupier, and not just on lots owned by the developer. *See State ex rel. Ashcroft v. Whipple*, 647 S.W.2d 596, 600 (Mo.App. 1983).

We note in passing that under the regulations, "[e]limination shall be accomplished by connection to an available municipal or public sewer district sewer system or a sewer system regulated and certified by the Missouri Public Service Commission and which is in compliance with the Missouri Clean Water Law and regulations." 10 C.S.R. 20–6.030(1)(D) (1984). A sewer system "shall be deemed available when any part of such sewer system is located within 150 feet of the property line of the residence unless the DNR is of the opinion that connection thereto is unreasonable." *Id.* In the instant case the evidence showed, and the Commission found, that the nearest sewer district connection is approximately "one-half mile" from the Scheble development.

▮ The circuit court concluded that the Commission had violated its own regulation by requiring connection to a district more than 150 feet from any property line. We disagree. The intendment of 10 C.S.R. § 20–6.030(1)(D) is that connection shall be accomplished when the sewer system is within 150 feet. However, the Commission's discretionary powers, as granted by the legislature in § 204.056.6, are not curtailed by this regulation. The statutory grant of power allows the Commission to issue and enter a final order, following consideration of the record after hearing, "as it deems appropriate under the circumstances." Of course, the 150 foot rule is to serve as a guideline in the exercise of discretion, as evidence by the power of the DNR thereunder to forgo requiring hookup of a residence within 150 feet of the district if it is the opinion that connection is unreasonable. However, although the 150 foot rule is mandatory where it exists and is reasonable, the Commission is not prohibited from ordering connection to a system beyond 150 feet, if the sewer district agrees. Here, the Commission provided an alternative in the event of the district's refusal.

▮ Next, the circuit court concluded that the Schebles were relieved of complying with the remedy ordered by the Commission because they "met the requirements of the Jefferson County Building Commission." The court apparently deemed that the Jefferson County ordinances preempted the state Clean Water Law; or perhaps it believed that developers have a choice between following Missouri or Jefferson County rules and regulations. Whichever, the conclusion is erroneous. Having met the requirements of the Building Commission does not serve to relieve the Schebles from the enforcement of the Clean Water Law against them. As we have discussed, the Schebles have clearly

violated the Clean Water Law. Their alleged compliance with the Jefferson County Building Code does not in any way diminish their violations. Building Codes are designed to ensure safe construction, adequate means of handling possible disasters, and a reasonably healthful environment. O. Reynolds, Local Government Law § 122, at 403 (1982). Prevention and abatement of water pollution and insuring high water quality is the purpose of the Clean Water Law and a violation thereof is no less a violation when compliance has been made with the local building code. Hence, the circuit court erred in reversing the Commission on this ground.

■ The circuit court also reversed the Commission because the Commission found the Scheble subdivision to be a "new development" under its regulations. The circuit court found, as a matter of law, the Scheble subdivision to be an "existing development." "New developments" must comply with 10 C.S.R. § 20–6.030(3)(A) (1975), while "existing developments" are subject to the requirements of 10 C.S.R. § 20–6.030(2) (1975). Because the Commission has predicated its order, in part, on the violation of § 20.030(3)(A) (1975), i.e., the Schebles failure to file an engineering report, the circuit court concluded that Commission's order was arbitrary and unreasonable.

Regulation 10 C.S.R. § 20–6.030(2)(A) (1975) defines a "new development" as one "for which control of less than twenty (20) percent of the lots has been permanently relinquished before July 1, 1974." Existing developments are defined as those where the developer "has sold or entered into a contract for deed in which has permanently relinquished control of twenty (20) percent or more of the lots in a subdivision prior to July 1, 1974. . . ." 10 C.S.R. § 20–6.030(2)(B) (1975). Here, the Schebles had not purchased any of the undeveloped property that they developed as part of their subdivision prior to July 1, 1974. Certainly, they had not sold more than twenty (20) percent of those lots. Hence, the Commission correctly concluded that the Scheble subdivision was a new development and the

circuit court had no grounds for reversing on that basis.

In their third point, appellants maintain that the trial court erred in reversing the Commission's order based on its conclusion that the state was estopped by laches from ordering the Schebles to connect their subdivision to a centralized sewer system. The circuit court reached this conclusion because it found that in 1976 DNR "had in its grasp all of the facts necessary and all of the resources necessary to determine the status of the impermeability of the soil and the like." The court pointed to the 1976 geologic evaluation conducted by Dr. Williams as the source of this knowledge.

We note initially that it has long been held in Missouri that the state is not affected by the laches of her agents and that laches is not imputable to the state. *See, e.g., Marion County v. Moffett*, 15 Mo. 604, 606 (1852); *Parks v. State*, 7 Mo. 194, 196 (1841). Although modern times have seen the erosion of sovereign immunity in its various forms, including immunity from the equitable defense of laches, *State of California ex rel. State Lands Commission v. United States*, 512 F.Supp. 36, 41 (N.D.Calif.1981), we need not decide the state's immunity in the instant case. We conclude that regardless of the doctrine of sovereign immunity, the state has not been guilty of laches.

■ The invocation of laches requires that a party with the knowledge of facts giving rise to its rights unreasonably delays asserting them for an excessive period of time and the other party suffers legal detriment therefrom. *Rich v. Class*, 643 S.W.2d 872, 876–77 (Mo.App.1982). In determining whether to apply the doctrine of laches, we examine the length of delay, the reasons therefor, how the delay affected the other party, and the overall fairness in permitting the assertion of the claim. *See Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 806 (8th Cir.1979)

■ Here, Robert Zeman testified that the Water Pollution Control Section of DNR's St. Louis Regional Office was not aware that the Schebles were developing tracks D, E, and F until the fall of 1981.

Zeman and the Water Pollution Control Section of DNR were under the impression, and it reasonably appeared, that the entire Wood View Acre development was connected with L.K. Wood. In light of the circumstances in which events transpired, we find nothing unreasonable about the DNR being mistaken about the true nature of the Scheble development. It was L.K. Wood that concerned the DNR. L.K. Wood had filed the required engineering report, while the Schebles went ahead and developed without notifying the Water Pollution Section of its activities. Indeed, the first recorded contact that DNR had with the Schebles was not until 1980, and at that time Donald Boos spoke with Mrs. Scheble about the pollution problems in Wood View Acres. Mrs. Scheble did not volunteer any information relating to her and her husband's participation in the sale of lots.

On October 5, 1981, DNR cited the Schebles for an alleged violation of the Clean Water Law. Because the DNR did not know the Schebles were developers until the fall of 1981, we find no unreasonable delay between the time of discovery of the violation and the time in which the DNR moved to abate the violation. We are aware of the length of time between when the Schebles began development and the time that they were discovered to be developers. But again, if there be any fault in this it rests with the Schebles because they began developing and continued developing without filing an engineering report. We conclude, in viewing the totality of the circumstances, that in overall fairness the DNR was properly allowed by the Commission to assert its claim against the Schebles and that the circuit court was in error to reverse based on laches.

In their last point, appellants claim that the circuit court erred in reversing the decision of the Commission based on the court's conclusion that the Schebles were denied a fair hearing due to a biased and partial hearing officer. The circuit court found "that the advocacy of the hearing commissioner in this case was partial to the State, exhibited bias and amounted to unlawful procedure and an unlawful trial." The circuit court found two specific instances that violated the fair hearing requirements set forth in *Jones v. State Department of Public Health and Welfare,* 354 S.W.2d 37 (Mo.App.1962). The circuit court found that the hearing commissioner improperly rehabilitated an impeached witness and ushered in a key piece of evidence that would not have been admitted because of a lack of foundation.

The *Jones* case teaches that administrative proceedings should be conducted in accordance with fundamental principles of justice and fairness. Such principles require that all parties receive a fair hearing before the administrative tribunal. A fair hearing, as defined in *Jones,* is "[o]ne in which authority is fairly exercised, that is, consistently with the fundamental principles of justice embraced within the conception of due process of law." 354 S.W.2d at 39 (quoting 35 C.J.S. at 598). The fair hearing requirement is not satisfied unless the hearing is conducted by an impartial officer, free of bias, hostility, and prejudgment. *Id.* at 40.

Here, two instances are referred to by the circuit court as demonstrating the hearing Commissioner's bias against the Schebles. The first incident occurred after counsel for the Schebles had cross-examined Robert Zeman as to the accuracy of Exhibit 28–A (a map of Wood View Acres). The following transpired during cross-examination:

Q   Back to this Exhibit 28–A. Just as you placed the homes on the plat without a survey, is that also as to the placement of the ends of the pipes and the discharges that you observed?

A   Yes.

Q   You didn't survey any lines?

A   No.

Q   So you just went from your best guess?

MR. NOEL (Hearing Commissioner): Well—

MR. HAMMON: This is cross examination.

MR. NOEL: I understand. I'm not— my advocacy is opposed to my judicial role and is crossing over.

MR. HAMMON: I know that.

Q (By Mr. Hammon) You just went by your best guess as to the locations as it relates to the legal plats?

A Yes. I'd be in the subdivision on numerous occasions. And in some cases I paced off distances, eyeballed what I thought the footage was from the street to the house—

MR. NOEL: I want the record to say that this witness has testified on direct examination that this was not a guess. It was his best approximation of where those items were located.

Following cross-examination, the hearing commissioner asked the following question of Mr. Zeman:

Q Exhibit 28–A and all the Exhibits, 28–A, B, and C, do those represent your best effort to approximate the locations of the houses, discharges, pipes, and other items referenced on those Exhibits?

MR. HAMMON: Your Honor—

MR. ROBERTSON: I'll object.

MR. HAMMON: Your Honor, I'm going to have to object to it on this basis. I think it's an attempt to rehabilitate a witness that has been impeached on this very matter, and I object on that basis.

MR. NOEL: Overruled.

MR. ROBERTSON: I object also.

Q (By Mr. Noel) You may answer.

A Yes.

After the foregoing transpired, the hearing commissioner put the following statement on the record:

I want to make one statement for the record. I may have said something that I'm not sure whether it got on the record, and I want to make sure it was characterized in its proper tone. I said something about advocate on the record. And the tone that that was intended to be stated in was in an effort as my experience and background as a trial lawyer as opposed to not having experience as a judge. And it certainly was not meant to indicate by me nor should it be construed to indicate by me that I am taking an advocacy position with respect to any particular party in this matter.

The second incident that the circuit court found to deny the Schebles a fair hearing concerned the chain of custody of the samples taken by Robert Zeman that were analyzed for fecal coliform and the admission of DNR Exhibit 70 evincing the chain. The three persons in the chain of custody were Robert Zeman, Douglas Lind, and Mary Weeks. Both Zeman and Weeks were put on as state witnesses. Zeman testified as to collecting the samples, tagging them, putting them in an ice chest, filling out a chain of custody form (Exhibit 70), signing the form, and turning the ice chest over to Douglas Lind (the attorney representing DNR in this matter) to transport to Jefferson City. Mary Weeks testified that she personally received the samples listed on the chain of custody form from Douglas Lind and that she had signed the form. Douglas Lind did not testify. However, during the course of the proceeding the hearing commissioner asked the following question of Mr. Lind, while Mr. Lind was conducting the direct examination of James Long, Director of Laboratory Services for DNR:

Hearing Commissioner: Mr. Lind, I want to ask you on the record, did you receive these items [samples collected by Zeman] on September 1, 1982 at 3:30 P.M.?

MR. LIND: Yes, I did.

Mr. Hammon, the attorney representing the Schebles, interposed the following objection.

MR. HAMMON: I would like to object to the fact that the Hearing Officer is required to put into evidence to make this Exhibit admissible under the law, and I think it's improper for the Hearing Officer to be required to do that when it's the state's burden to prove its case rather than have the assistance of the Hearing Officer.

The hearing commissioner responded:

I'm not giving any assistance at all. I want to be able to make a ruling on the objections that you all have made, and that is the purpose of my questioning.

And I do think that a Hearing Officer or a Judge or anyone has the authority

under Missouri law to ask questions of witnesses. Hearing no further objections to Exhibit 70, I'm going to allow its admission on the further condition that, if any of the parties wish to examine Mr. Lind as with respect to this Exhibit, they may feel free to call him in their case. But Mr. Zeman has already been examined on it.

Although the hearing commissioner's remarks were improper and regrettable, we do not find that they rose to the level found in *Jones,* 354 S.W.2d 37, to warrant reversal and a new hearing. *See Brown v. McNeal,* 586 S.W.2d 359, 362 (Mo.App. 1979). *See also Tele-Trip Company, Inc. v. N.L.R.B.,* 340 F.2d 575, 581 (4th Cir. 1965). The comments contained in *Tele-Trip* are equally applicable here.

■ As to the first incident, the hearing commissioner clearly realized his mistake. For the record he made clear that nothing he had said was intended to show partiality or advocacy for any side. Moreover, as to the Commissioner's question put to Robert Zeman, the record does reflect that Mr. Zeman testified on direct examination that he made his markings on the map exhibits based upon his best approximation. And, that based on his personal observations, the exhibits fairly and accurately represented Wood View Acres. The testimony brought out by the commissioner was merely cumulative.

■ As to the second incident, the hearing commissioner asked his question of Mr. Lind after repeated objections to the admissibility of Exhibit 70, the form indicating the chain of custody. Clearly, the hearing examiner is free to and should interrupt witnesses on occasions when necessary to clarify testimony or understand an exhibit. However, he must be impartial and care must be given not to attempt to establish proof to support the position of any party to the controversy. Here, the commissioner came close to crossing the line. However, Exhibit 70 was fully admissible apart from the question asked by the commissioner. The circuit court ruled that Exhibit 70, showing the chain of custody of the samples collected by Zeman, was inadmissible because the actual chain of custody was not established. As we have discussed *supra,* the testimony of Robert Zeman and Mary Weeks was sufficient to provide the necessary "reasonable assurance" that the samples taken by Zeman, as reflected on Exhibit 70, were not substituted or altered prior to analysis or trial. Thus, the Commissioner's question did not assist in the admission of Exhibit 70 because the chain of custody, as reflected in the Exhibit, was established without resort to testimony by Douglas Lind. Although we do not approve of the Commissioner's actions, they did not violate the fundamental principles of justice and fairness.

For the foregoing reasons the judgment of the circuit court must be reversed and the order of the Commission, as it relates to the Schebles, is affirmed.

GARY M. GAERTNER, P.J., and STEPHAN, J., concur.