Jim MUELLER, Linda Poe, and Francis Eileen Nichols, Petitioners–Appellants,

v.

MISSOURI HAZARDOUS WASTE MANAGEMENT COMMISSION and Atlas Environmental Services, Inc., Respondents–Respondents.

No. 19616.

Missouri Court of Appeals,
Southern District,
Division One.

July 25, 1995.

John E. Price, Springfield, for petitioners-appellants.

Byron E. Francis, Armstrong, Teasdale, Schlafly & Davis, St. Louis, for respondent Atlas Environmental.

Jeremiah W. (Jay) Nixon, Attorney General and Shelley A. Woods, Assistant Attorney General, Jefferson City, for respondent Missouri Hazardous Waste.

SHRUM, Chief Judge.

This case arises from the efforts of Atlas Environmental Services, Inc. (AES) to obtain a permit from Missouri's Department of Natural Resources (DNR) to build and operate a hazardous waste disposal facility in Jasper County.

After DNR issued the permit, Appellants [1] appealed that decision to the Missouri Hazardous Waste Management Commission.[2] The Commission conditionally approved the permit—after modifying it—and directed DNR to take described "remedial measures." When DNR later reported its "remedial measure" compliance, the Commission issued its final order approving AES's permit. Appellants then sought judicial review of the Commission's orders. After review of the record, the trial court affirmed the Commission's orders.

This appeal involves application of the "Missouri Hazardous Waste Management

**1.** We sustained the motion of Brenda White to dismiss her appeal.

**2.** We refer to Atlas Environmental Services, Inc., and Missouri Hazardous Waste Management Commission individually as "AES" and "the

Law," RSMo §§ 260.350–260.434,[3] and regulations promulgated thereunder. For the sake of brevity, we will refer to the Missouri Hazardous Waste Management Law as "the Act." The dispositive issue concerns the scope of the Commission's adjudicative authority under the Act when reviewing newly issued hazardous waste disposal facility permits, specifically, whether it has authority to modify such permits without remand to the DNR? We answer, "No." We reverse and remand.

## FACTS

Appellants are private citizens who live in or near Joplin. Their standing as "aggrieved persons" is not challenged on appeal. AES is a wholly owned subsidiary of Atlas Powder Company (Atlas). Atlas is headquartered in Dallas, Texas, and it operates an explosives manufacturing plant in Joplin.

Historically, Atlas disposed of its reactive wastes by a process known as "open burning/open detonation" (OB/OD). In the late 1980's Atlas decided to apply for a permit to build an incineration facility, which was deemed by the Environmental Protection Agency (EPA) to be a suitable technological alternative to the OB/OD process of explosive and hazardous waste disposal.

Atlas planned to have their subsidiary, AES, build the incinerator at the Atlas plant in Joplin. Atlas intended to incinerate not only its own waste generated at the Joplin plant, but also similar waste from its other plant in Pennsylvania and explosive waste from other generators located around the country. Before construction of the incinerator could begin, AES needed permits from DNR and EPA, including a hazardous waste facility permit from DNR.

AES filed its first permit application with DNR in November 1989. On March 29, 1991, after AES had submitted several revised applications, DNR issued a draft permit to construct the incinerator. Notice of DNR's intent to issue the permit was pub-lished and a public hearing on the issue was held in Joplin on May 9, 1991. Many people, including Appellants, participated in this hearing, with some also submitting written comments to DNR about the draft permit. The AES permit was officially issued on July 18, 1991.

Appellants timely filed their notice of appeal of the AES permit to the Commission. After an evidentiary hearing conducted by the Commission's designated hearing officer, the Commission issued its Findings of Fact, Conclusions of Law, and Order on January 20, 1993. In its order the Commission conditionally approved the permit but only after modifying it and requiring DNR to take described "remedial measures." In part, the Commission directed DNR to file with the Commission a written evaluation of AES's status as a "Habitual Violator" of environmental laws and a re-assessment of transportation routes and response capabilities of local government units.

In April 1993, DNR filed with the Commission its written evaluation of whether AES and Atlas were habitual violators, the report concluding they were not. DNR also filed with the Commission its new assessment of transportation routes and response capabilities of local government units. The Commission gave Appellants an opportunity to make written objections to these reports, an opportunity of which Appellants availed themselves.

On May 21, 1993, the Commission entered its final order. In part, the Commission found that neither AES nor Atlas was a habitual violator as defined by statute and regulations. Moreover, the Commission approved and incorporated into its order DNR's report on transportation routes and response capabilities of local governments. The Commission then ordered the permit to be "in full force and effect, as modified."

Appellants sought review in the Jasper County Circuit Court, alleging numerous errors committed by DNR in the permit pro-

Commission." Collectively, we refer to them as "Respondents."

**3.** Section 260.350 would appear to limit the Missouri Hazardous Waste Management Law to

§§ 260.350–260.430. Section 260.350 has not been amended since enactment in 1977. Since that date, §§ 260.431–260.434 have been enacted by the legislature.

cess and by the Commission in the administrative appeal process. After briefing and argument, the trial court on May 10, 1994, entered its order denying the petition for review. This appeal followed.

## DISCUSSION

*Point I: Scope of the Commission's Adjudicative Authority*

In their first point, Appellants contend that the Commission, in reviewing DNR's actions, acted in excess of its statutory authority when it "unilaterally" modified the permit. They insist that the Commission lacked authority to make any modifications in the permit; that it could only affirm, reverse, or reverse and remand DNR's decision regarding the permit; and that the modification procedure followed by the Commission violated statutory and regulatory requirements designed to insure public scrutiny of the permitting process. Thus, Appellants directly call into question the scope of the Commission's adjudicative authority when reviewing on appeal an original permit application.

Apparently, the legislature intended to extend adjudicative authority to the Commission to review DNR decisions that approve or reject initial applications for Hazardous Waste Management Facility Treatment and Storage permits. We say "apparently" because the Act is not a model of clarity in this regard.

Section 260.370.3(3),[4] empowers the Commission to:

"*Hold hearings,* issue notices of hearings and subpoenas requiring the attendance of witnesses and the production of evidence, administer oaths and take testimony *as the commission deems necessary to accomplish the purposes of sections 260.350 to 260.430 or as required by any federal hazardous waste management act....*"

Section 260.395.11 reads:

"11. *Whenever a permit is issued ...* [or] denied ... by the [DNR], *any ag-*

*grieved person,* by petition filed with the [DNR] within thirty days of the decision, *may appeal such decision and shall be entitled to a hearing as provided in section 260.400.*"

The pertinent part of § 260.400 (referenced in § 260.395.11), provides:

"1. At public hearings *on ... appeals of decisions hereunder,* all hazardous waste facilities ... who are involved in such hearings shall have an appropriate person present....

"2. *In any hearing,* any member of the commission or the hearing officer shall issue in the name of the commission notice of hearing and subpoenas and shall be authorized to require that testimony before such hearing be given under oath....

"3. All hearings to adopt standards, rules and regulations, or to adopt the state hazardous waste management plan shall be held before at least four members of the commission. *All other hearings* may be held before one commission member designated by the commission chairman or by a hearing officer ... appointed by the commission chairman.... The hearing officer or commission member shall make recommended findings of fact and may make recommended conclusions of law to the commission.

"4. All final orders or determinations *or other final actions by the commission* shall be approved in writing by at least four members of the commission...." (Emphasis added.)

Arguably, the foregoing provisions do not expressly impose a duty on the Commission or explicitly empower it to hear § 260.395.11 appeals. Nevertheless, from the language employed—specifically that emphasized by italics above—we are convinced that the legislature intended such appeals be heard by the Commission.

Less clear, however, is the scope of the Commission's authority in disposing of § 260.395.11 appeals. Although Respondents argue to the contrary, nothing in the

4. Unless otherwise indicated, all statutory citations throughout this opinion are to RSMo 1994. Statutory provisions relevant to Point I have not been amended since the Commission issued its orders in 1993.

Act *expressly* empowers the Commission to make "final orders or determinations or other final actions" at the conclusion of a § 260.395.11 appeal. The Commission's authority in that regard is found only in the "catch-all" language of § 260.370.3(5) wherein the legislature empowered the Commission to "[m]ake such orders as are necessary to implement, enforce and effectuate the powers, duties and purposes of sections 260.350 to 260.430."

As the legislature failed to expressly declare what the Commission can do in rendering a decision after hearing a § 260.395.11 appeal, it becomes our task to construe the meaning of the statutory language. *See Vice v. Thurston,* 793 S.W.2d 900, 905[6] (Mo.App. 1990). We look to the purpose of the statute and any evident legislative intent to seek construction. *See AT & T v. Wallemann,* 827 S.W.2d 217, 223[11] (Mo.App.1992); *Lederer v. State, Department of Social Services, Division of Aging,* 825 S.W.2d 858, 863[17] (Mo.App.1992). In that undertaking, we take account of " 'the policy adopted by the Legislature in reference to the subject-matter, the object of the statute, and the mischief it strikes at or seeks to prevent, as well as the remedy provided.' " *AT & T,* 827 S.W.2d at 223 (quoting *State ex rel. Lentine v. State Board of Health,* 334 Mo. 220, 65 S.W.2d 943, 950 (1933)).

Stated broadly, the purpose of the Act is "to prevent hazardous waste mismanagement practices." *Jerry–Russell Bliss v. Hazardous Waste,* 702 S.W.2d 77, 81 (Mo. banc 1985). By its enactment the legislature intended " 'to establish a "cradle-to-grave" hazardous waste tracking program that, among other things, requires ... an appropriate treatment ... or disposal facility.' " *See State ex rel. Webster v. Missouri Resource Recovery, Inc.,* 825 S.W.2d 916, 923–24 (Mo. App.1992) (quoting 2 Mo.Environmental Law, § 11.1 (Mo Bar 1991)). The legislature via the Act re-affirms that the preservation of the public health is a goal of the highest priority. *Jerry–Russell Bliss,* 702 S.W.2d at 81.

■ The Act is remedial in nature; consequently, we interpret all of its provisions broadly and liberally in order to effect its plain purpose. *See Missouri Resource Recovery, Inc.,* 825 S.W.2d at 925. *See also Scheble v. Missouri Clean Water Com'n,* 734 S.W.2d 541, 556[10] (Mo.App.1987). Our duty to broadly and liberally construe the Act extends to provisions that concern the Commission, including § 260.370.3(5). This follows because the Commission is part of the administrative machinery designed to achieve the purposes and goals of the Act.[5]

■ Where, as it is in this case, the empowering statute is not explicit, but confers powers in general terms, appellate courts may resort to the necessary implications and intendments from the language to determinate legislative intent. *AT & T,* 827 S.W.2d at 223–24[12] (citing *State ex rel. McKittrick v. Wymore,* 345 Mo. 169, 132 S.W.2d 979, 987–88[17–19] (banc 1939)). "An implied power within this meaning is a power necessary for the efficient exercise of the power expressly conferred." *AT & T,* 827 S.W.2d at 224. That which is properly implied in a statute is as much a part of the legislation as that which is expressly stated. *Id.*

The rule of statutory construction that extends a statute by necessary implication has been given recurrent application in the construction of legislation delegating powers to public officers and administrative agencies. *Id.* "Thus, the powers and duties of a public officer or agency in addition to those expressly given by statute include 'those lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which, although incidental and collateral, serve to promote the accomplishment of the principal purposes.' " *Id.* (quoting *McKittrick,* 132 S.W.2d at 987[17] ). "A statutory grant of a power [to an official or agency] carries with it, by implication, everything necessary to carry out the power or right

---

**5.** In § 260.370.1, the legislature directs that, as part of its duties, the Commission promulgate rules and regulations to "encourage that every effort is made to effectively treat ... hazardous waste ... in ... Missouri in order that such wastes are not disposed of in a manner which is hazardous to the public health and the environment."

and make it effectual and complete." *McKittrick*, 132 S.W.2d at 988.

However, other principles suggest that the breadth of the Commission's adjudicative authority is not unlimited. An administrative agency possesses no more authority than that granted to it by statute. *AT & T*, 827 S.W.2d at 221. Although administrative agencies may exercise "quasi judicial" powers—or even judicial powers—that are " 'incidental and necessary to the proper discharge' of their administrative functions," their adjudicative authority is not plenary. *State Tax Commission v. Administrative Hearing Commission*, 641 S.W.2d 69, 75 (Mo. banc 1982). An administrative agency's power is not to be expanded by implication simply because that power would facilitate the accomplishment of an end deemed beneficial. *Dishon v. Rice*, 871 S.W.2d 126, 128[4] (Mo.App.1994). Implication of a power is properly found only if the power necessarily follows from the language of the statute. *Scheble*, 734 S.W.2d at 556; *Brooks v. Pool–Leffler*, 636 S.W.2d 113, 119[11] (Mo.App. 1982).

The foregoing principles of statutory construction reveal the complexity of the question. *See Brooks*, 636 S.W.2d at 119. On the one hand, we must aspire to effectuate the statutory purpose intended by the legislature. *Id.* On the other, we must temper our decision with the fact that it is for the legislature, not the judiciary, to establish the means through which the statutory purpose is to be achieved. *Id.* With these principles in mind, we turn to the question at hand. In order for the Commission to effectually and completely " 'implement, enforce and effectuate the powers, duties and purposes . . .' of [the Act]," is it necessary that the Commission have the implied authority to change AES's permit as it did in this case? We answer "No."

As noted above, the legislature's overriding concern in enacting the Act was to establish a framework to insure the safe management of hazardous wastes and preserve the public health and environment. *Missouri Resource Recovery, Inc.*, 825 S.W.2d at 923–24. In developing that framework the legislature did not expressly delegate power to the Commission to modify a hazardous waste permit where it is reviewing an appeal from a DNR decision to grant an initial permit application. *See* §§ 260.370.3(3), 260.370.3(5), 260.395.11, and 260.400. Yet, in another part of the Act, § 260.410, the legislature explicitly empowered the Commission to modify DNR orders when the issue on appeal is whether violations of the Act have occurred. Thus, § 260.410.1 directs the DNR to make investigations of alleged violations of the Act or of any rules, regulations, orders, license or permits issued under the Act. If DNR finds a violation, it may, "by conference, conciliation or persuasion, endeavor to eliminate the violation." § 260.410.2. Continuing, § 260.410.3 provides:

"3. In case of the failure by conference, conciliation or persuasion to correct or remedy any claimed violation, *or as required to immediately and effectively halt or eliminate any imminent or substantial threats to the health of humans or other living organisms* resulting from the claimed violation, the [DNR] may order abatement of the violation or may revoke any license, or any hazardous waste . . . permit which may have been issued hereunder. . . . Any person against whom the [DNR] issues an order or revocation may appeal it by filing a petition with the commission within thirty days. The appeal shall stay the enforcement of the order or revocation until final determination by the commission. . . . *The commission may sustain, reverse or modify the [DNR's] order or revocation or may make such other orders as the commission deems appropriate under the circumstances. . . .*" (Emphasis added.)

Why did the legislature explicitly empower the Commission to modify DNR decisions on appeal under § 260.410 but confer no similar express power to the Commission when reviewing appeals from the issuance of a hazardous waste permit? The language of § 260.410.3 supplies part of the answer. That section makes it clear that the legislature was concerned about immediacy of action at all administrative agency levels when violations of the Act are charged. By defini-

tion, persons or entities who violate the Act threaten the public health or environment or both. § 260.360(11).[6] When violations occur, expedient use of both regulatory and adjudicative authority aids in accomplishing the purposes of the legislation. In such instances, it would be inimical to the goals of the Act to limit the Commission's decisional authority to affirming, reversing, or reversing with directions. Had the legislature not given the Commission express authority under § 260.410.3 to modify DNR decisions concerning violations, implication of that power might well have been necessary.

■ However, the fact that an administrative agency is empowered in one instance does not mean that it has the power for all purposes and all cases. *Racine Fire and Police Commission v. Stanfield,* 70 Wis.2d 395, 234 N.W.2d 307, 311 (1975). It is only where the power is necessary to carry out an express power or to perform an express duty, or where the action arises out of the performance of statutory powers or obligations that the implied power exists. *Id.* Moreover, where a legislative body " '[h]as consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power.' " *State Highway Commission of Missouri v. Volpe,* 479 F.2d 1099, 1114[24] (8th Cir.), 27 A.L.R.Fed. 183 (1973) (quoting *Alcoa Steamship Co. v. Federal Maritime Commission,* 121 App.D.C. 144, 348 F.2d 756, 758 (1965). As stated before, there is no reference to the power to modify a permit or a DNR decision in § 260.370.3(5) although such authority is expressly conferred both in § 260.410.3 (pertaining to violations of the Act) and in other environmental laws. *See* § 644.026(13) (authority of the Clean Water Commission) and § 643.060(4), RSMo1986 1986 (repealed) (authority of the executive secretary of the Air Conservation Commission). We conclude from such enactments that when the legislature wishes to confer adjudicative authority that includes power to modify, it says so. *See Alaska Airlines, Inc.*

*v. Civil Aeronautics Board,* 103 App.D.C. 225, 257 F.2d 229, 230[1] (1958).

Apparently the legislature intended that applications under the Act for permits be subjected to a deliberative process. Such process includes study, investigation, public hearings, citizen participation, and utilization of DNR expertise any time that the Commission finds on appeal that the permit was deficient. Although AES contends that such reasoning renders the Commission "virtually powerless in the permit review process" and "would clearly be in contradiction of the Commission's broad statutory mandate," such arguments are only minimally developed. Specifically, AES's argument is as follows:

> "Appellants contend that any issue or defect [in the permit], however insignificant, requires a remand to [DNR], the institution of permit modification proceedings, a reopening of the public comment period with opportunity for public comment and a public hearing, the issuance of a modified permit and, finally, a separate appeal to the Commission. Such a never-ending process would obviously subvert the regulatory process designed to protect human health and the environment into a process which would render the permitting of hazardous waste facilities impossible."

Summarized, both AES and the Commission take the position that expediency requires that the Commission be empowered by implication to modify on appeal an original permit in order to effectually and completely serve the purposes of the Act. We disagree.

Not even a liberal interpretation of the Act compels such a view. Respondents' assertions that remand of faulty permits to DNR would result in a "never-ending process," "subvert the regulatory process," and make "permitting of hazardous waste facilities impossible" are specious arguments. Remand simply assures that the DNR, the agency with the staff, investigatory authority, expertise, and explicit authority to issue hazardous waste permits, will have the opportunity to

---

**6.** Prior to a 1993 amendment to the Act, the definition of "Hazardous waste" appeared at § 260.360(10).

do it right, i.e., in compliance with all statutes and regulations. The authority to modify is not necessary to the efficient performance of the Commission's duty to review an appeal from permit issuance or denial. *See Peerless Fixture Co. v. Keitel,* 355 Mo. 144, 195 S.W.2d 449, 452 (1946).

Respondents' argument that the Commission has implied authority to modify all DNR decisions is negated by the fact that the legislature has expressly extended such power to the Commission and other agencies when it intended to do so. Evidently, the legislature did not agree with Respondents' arguments because it could easily and clearly have empowered the Commission to modify newly issued permits. After a careful examination of the entire Act, we conclude that the legislature did not intend that the Commission could modify newly issued permits when it empowered the Commission to "[m]ake such orders as are necessary to implement, enforce and effectuate the powers, duties and purposes of sections 260.350 to 260.430." We hold that the Commission did not have the implied authority to modify AES's permit.[7] Reversal is necessary.

We briefly address some of the remaining issues in this case that are likely to arise again.

*Point VII B: Use of Department of Health for Health Profile*

■ In Point VII B, Appellants contend that a health profile required by statute and regulation to be part of a permit application, was not reviewed and approved by the DNR. Although AES prepared a health profile, Appellants assert that DNR improperly delegated full responsibility to the Missouri Department of Health (DOH) to review and approve that profile, thus abdicating its responsibility and avoiding its duty with regard to the health profile requirement. Their position is that DOH lacked authority to conduct the review or grant approval; hence, the Commission erred when it approved a permit based on an application with a health profile reviewed by DOH only and not by DNR.

The only statutory reference to the "health profile" requirement is in § 260.395.7:

"Any person before constructing ... or operating a hazardous waste facility ... shall file an application which shall:

" . . . .

"(5) ... [Contain] a profile of the health characteristics of the area which identifies all serious illness, the rate of which exceeds the state average for such illness, which might be attributable to environmental contamination...."

7. We have not ignored cases cited by AES; however, we conclude they do not support Respondents' position. First, contrary to AES's assertion, we find nothing in *Citizens for Rural Preservation v. Robinett,* 648 S.W.2d 117, 129 (Mo.App. 1982), to support AES's claim that "[i]n [the *Robinett* ] opinion, the court acknowledged the power of the [air conservation commission] to make ... permit modification[s] based upon the commission's general statutory power to deny any permit unconditionally." The provision cited in *Robinett* at 129[22], § 203.075.3, RSMo1978 (transferred to § 643.075.3, RSMo1986), extended certain powers to the **executive secretary** of the air conservation commission. It had nothing to do with empowerment of the commission. The air conservation commission was expressly authorized to "sustain, reverse, or modify any action of the executive secretary...." § 203.060(4), RSMo1978 (transferred to § 643.060(4), RSMo1986). *Robinett* does not aid respondents. Second, *Director, West Virginia Department of Natural Resources v. Gwinn,* 185 W.Va. 442, 408 S.E.2d 21 (1991), is factually distinguishable. There the reviewing board was expressly empowered to "enter an order *affirming, modifying or vacating the order of the [DNR],* or *shall make and enter such order as the [DNR] should have entered,* or *shall make and enter an order approving or modifying the terms and conditions of any permit issued....* (Emphasis added.)" *Id.* 408 S.E.2d at 23. West Virginia's DNR denied a permit application. On appeal, the reviewing board issued the permit. On further appeal, the trial court reversed, saying the board lacked authority to issue a permit. The appellate court reversed the trial court saying: "If, in the first phrase, the word 'order' can mean a permit for the purpose of vacating a permit, it also means permit for the second phrase allowing the Board to enter an order the [DNR] should have entered." *Id.* at 24. Continuing, the *Gwinn* court observed: "If, as the appellees suggest, 'order' should be interpreted only as 'order' and not a permit, then the Code would provide a right of appeal when a permit is denied, but no remedy. The only way to provide a remedy is to interpret 'order' to include a permit." *Id.* The circumstances of *Gwinn* do not occur in this case.

DNR has promulgated regulations to fill in the void left by the statute. Specifically, 10 C.S.R. § 25–7.264(2)(P) provides guidance about what the health profile is to address and directs that a permit applicant must "consult the [DOH] regarding appropriate factors to be included in the profile prior to initiating the health profile." 10 C.S.R. § 25–7.264(2)(P)1.

At the Commission hearing, a DNR employee testified that DNR does not have internal technical expertise to evaluate the issues associated with a health profile. Consequently, DNR has an interagency agreement with the DOH for the latter agency to provide "technical review and approval of all health profiles prepared as part of a hazardous waste treatment or disposal facility permit application to DNR."

As part of its involvement in the health profile endeavor, the DOH developed a document entitled "Guidelines for Writing a Hazardous Waste Health Profile," designed to help applicants for hazardous waste permits know what DOH expects in preparing a health profile.

Testimony at the Commission hearing established that, based on the understanding between the agencies, AES was directed to submit its health profile to DOH for evaluation. After review, DOH wrote DNR a letter that contained its comments and recommendations on the subject health profile. Included were nine recommendations for changes in the profile. DOH's letter also stated that, if the recommended changes are made, "the Atlas health profile is approved." The letter concluded, "[W]e do not recommend the permitting process be delayed for this revised health profile."

DNR then approved AES's health profile by referencing and incorporating into its permit the review and recommendations in DOH's letter, as follows:

"The facility is considered to be in compliance with the health profile requirements upon incorporation of the Missouri Department of Health Final responses dated April 22, 1991."

Before the Commission, Appellants made the same argument they now make on appeal, i.e., DNR improperly delegated its authority regarding health profiles to the DOH and, thus, failed to perform its duty to independently review and approve AES's health profile. The Commission rejected that argument, saying:

"[N]othing in the statute prohibits [DNR] from consulting with a sister state agency with the necessary expertise. [DNR] retains overall authority over health profile issues by its control for the permitting process. Requiring [DNR] to develop its own in-house capabilities to handle this function would be an unnecessary expenditure of state funds."

Section 260.375.(8) provides that DNR shall "Secure necessary scientific, technical, administrative and operational services, including laboratory facilities, by contract or otherwise...." We read this subsection as a grant of express authority for DNR to contract with DOH to obtain the latter's scientific or technical services as part of the permitting process. Because DNR and DOH entered into an interagency agreement that memorialized their relationship, the Commission correctly concluded that DNR could use DOH to evaluate AES's health profile. Not only was DNR authorized by statute to handle health profiles in this fashion, so long as DNR continues to be without the technical expertise within its own agency to evaluate health profiles, using DOH for that purpose is logical and practical and serves to promote the accomplishment of the principal purposes of the Act. We are unpersuaded by Appellants' arguments and case authority that DNR failed to review or approve AES's health profile.[8] Point VII B has no merit.

---

8. Many cases cited by Appellants recite general principles which, although sound, are not apropos to Appellants' contention that the Commission unlawfully delegated its power and responsibilities. *See, e.g., Soars v. Soars–Lovelace, Inc.,* 346 Mo. 710, 142 S.W.2d 866, 871 (1940) (Administrative agency cannot enlarge its authority by its own holdings or by contract); *Livingston Manor, Inc. v. Department of Social Services,* 809 S.W.2d 153, 156 (Mo.App.1991) (Agency's only authority is that granted by legislature and its power cannot be enlarged or conferred by consent or agreement); *State ex rel. Missouri Health Care Ass'n v. Missouri Health Facilities Review*

*Point VIII: Geologic, Environmental, and Economic Information*

In Point VIII, Appellants challenge issuance of the permit because the application lacked geologic, environmental, and economic information concerning the area around the incinerator site and because DNR did not supervise the field work by which certain information, submitted with the application, was obtained.

Appellants contend the following statutory provisions mandate submission of the information and supervision of the field work:

> "Section 260.395.7. ... Any person before constructing, substantially altering or operating a hazardous waste facility in this state shall file an application for a permit which shall:
>
> " . . . .
>
> "(4) Include such environmental and geologic information, assessments and studies as required by the rules and regulations of the commission;
>
> "(5) Submit with the application ... a profile of the environmental and economic characteristics of the area as required by the commission, including the extent of air pollution and ground water contamination. . . .
>
> " . . . .
>
> "(7) The department shall supervise any field work undertaken to collect geologic and engineering data for submission with the application."

We first consider the claim that the application did not contain necessary geologic, environmental, and economic information. It is undisputed that the Commission has promulgated no rules or regulations concerning the "profile of the environmental and eco-

nomic characteristics of the area" referred to in § 260.395.7(5).[9] In its order of January 20, 1993, the Commission stated, "The Commission simply has not exercised its discretion to require such a profile." In this appeal, Respondents reiterate this position, namely, that promulgation of rules and regulations regarding § 260.395.7(5), is a matter for the discretion of the Commission because the subsection contains the phrase "as required by the Commission."

Summarized, Appellants' argument is that, while the "extent and scope" of a profile might be a matter for the discretion of the Commission, the failure of the Commission to adopt rules and regulations has the effect of overriding the intent of the legislature that the information be a part of an application.

We agree with Respondents that nothing in § 260.395.7(5) directly requires the Commission to promulgate rules and regulations regarding profiles of environmental and economic characteristics. However, a "plain language" reading of an isolated subsection of the entire act does not answer the question raised by Appellants' Point VIII.

Section 260.370.3 grants the Commission broad authority to promulgate rules and regulations.[10] The subsection goes beyond a grant of authority, however. It also requires the Commission to adopt rules and regulations governing certain specified categories, and it mandates, "In implementing this subsection, the commission shall consider the variations within this state in climate, geology, population density, quantities and types of hazardous wastes generated. . . ." We believe the requirements for a permit application, as stated in § 260.395.7, provide strong evidence of some of the matters the legisla-

Comm., 768 S.W.2d 559, 562 (Mo.App.1989) (Agency has only such jurisdiction or authority as is granted by legislature); *Berry v. Moorman Mfg. Co.*, 675 S.W.2d 131, 134 (Mo.App.1984) (Administrative agencies, just as the general public, are bound by the terms of rules promulgated by them). Other cases cited are factually dissimilar. *See, e.g., Peerless*, 195 S.W.2d at 453 (Agency did not follow the procedure indicated by the statute and its own rules).

**9.** Appellants confine their argument to the absence from the application of "a profile," and we limit our discussion accordingly. We note the

absence of definitions in the statute and regulations that differentiate "a profile" (§ 260.395.7(5)) from "assessments and studies" (§ 260.395.7(4)). Presumably any document so designated would contain "information" (§ 260.395.7(4)) and "data" (§ 260.395.7(7)).

**10.** In addition to the express grant of authority in § 260.370.3, RSMo Supp.1992, there is an implied grant of authority under § 260.395.7, RSMo 1994, to issue rules and regulations applicable to that subsection.

ture believed the Commission "shall consider" in implementing § 260.370.3. The extent of the Commission's consideration of such matters, and whether the Commission erred in failing to promulgate the rules and regulations called for by Appellants, are issues for another day.

We now turn to the allegation of error based on the lack of DNR supervision of the field work that resulted in certain information submitted with the application. Appellants emphasize the plain language of § 260.395.7(7), namely, DNR "shall supervise any field work undertaken to collect geologic and engineering data for submission with the application."

Respondents' argument is essentially two-fold: (1) The Commission, in its discretion, has promulgated no rules and regulations regarding geologic and engineering data for submission with the application; thus, DNR cannot be faulted for not supervising the collection of that which is not required to be collected, and (2) The geological and engineering data submitted was not submitted as part of the application for the state permit; it was submitted to satisfy separate federal permit requirements.[11]

What we said earlier in our discussion under this point on appeal applies to Respondents' first argument. Regarding the second argument, we note the Commission, disposing of Appellants' "supervision-of-field-collection-of-data" argument in its January 20, 1993, order, appears to have relied on the information that Respondents now claim was a part of the federal application only. We believe the import of § 260.395.7(7) is clear: In evaluating an application for a permit, DNR and the Commission must limit their consideration to geologic and engineering data collected in field work supervised by DNR. Here, the Commission attempts to have the benefit of the data without imposing on DNR the responsibility for supervising its collection.

*Point XI: Radioactive Testing as Permit Condition*

In Point XI, Appellants contend that the Commission's permit modification requir-

ing AES to "obtain a device to check radioactivity of ... incoming waste" was not sufficiently specific to adequately protect human health and the environment. They insist that the order as written only requires AES to purchase a radioactivity testing device, not use it; hence, their argument that such permit condition is not legally enforceable. We disagree.

By its order, the Commission required that AES purchase a device "to check radioactivity of any incoming waste that has the potential for radioactive contamination." Reasonably read, the order says that not only must AES buy the device, it must use it "to check" incoming waste when radioactive contamination potentially exists. Point XI lacks merit.

*Other Claims of Error*

Although Appellants raise numerous other claims of error, we need not discuss their merits as it is not clear the same questions would recur. They are:

In Point II, Appellants allege the permit application was incomplete and failed to meet statutory and regulatory requirements, i.e., the application did not contain (1) sufficient detail in engineering and design data regarding facility construction, (2) information on waste feed rates for the pretrial burn phase of the operation, (3) the signature of the landowner (Atlas Powder), and (4) a professional engineer's seal on engineering documents submitted with the application. In large part, these issues are moot. The facility is constructed and pretrial burn testing has occurred; relevant information that would now accompany a permit application would be vastly different from that which was submitted earlier.

In Point III, Appellants claim that the Commission erred because the permit "contains conditions applicable to the storage and feed-handling building, which was a matter exclusively within the jurisdiction of the [EPA] at the time of permit issuance." This issue is moot because Missouri is now authorized by EPA to grant permits for 40 C.F.R.

---

11. The parties should consider the effect on this argument of the authorization granted Missouri

to issue Subpart X Miscellaneous Unit permits as noted in our discussion of Appellants' Point III.

Part 264, Subpart X "Miscellaneous Units." *See* Final Authorization of State Hazardous Waste Management Program: Missouri, 58 Fed.Reg. 3497 (January 11, 1993).

In Points IV and V, Appellants charge that the Commission erred in its handling of "habitual violator" issues. Since it issued its final order, the Commission has substantially modified its habitual violator regulation and the formula for determining habitual violator status. That change, coupled with the fact that other violations might have occurred since 1993, suggests that no useful purpose would be served by our review of Points IV and V.

In Point VI, Appellants contend that the Commission erred when, in its May 1993 order, it found that DNR had properly reassessed transportation routes and emergency response capabilities of local governments. In part, Point VI argues that DNR's reassessment did not comply with the Commission's January 20, 1993, order. Obviously, that issue will not arise again. Additionally, Point VI avers that DNR's reassessment "is factually erroneous as to the transportation routes needed to access the AES facility, and as to the sufficiency of off-site and on-site response capabilities of local governments based upon the uncontroverted evidence submitted by AES and [DNR]." We do not presume that the same evidence regarding these issues would be submitted again.

In Point VII A, Appellants complain that AES failed to consult the Division of Workers Compensation "for a description of the routes of occupational exposure and the occupational health effects on workers at like facilities" as required by 10 C.S.R. 25–7.264(P)(1)(B) (effective 10/1/86). The Commission has dropped that requirement from its regulations. Thus, this issue would not come up again.

In Point VII C, Appellants claim that the Commission erred in approving the health profile submitted by AES. Appellants adduced expert testimony that a field survey of population and demographic factors was required so as to produce meaningful information for the health profile and thus ensure that the facility "is protective of human health and the environment." Appellants argue the evidence does not support the Commission's finding that a field survey was not required for the health profile. We cannot assume what evidence would be produced in the future regarding this issue.

In Point IX, Appellants say the Commission erred when, via an unauthorized modification order, it allowed AES to submit "general operation procedures" as a "compliance schedule item" after the permit had been issued. Appellants insist that federal regulations mandate that such information be submitted as part of the permit application, thus assuring public input on the "standard operation procedure" issue. In light of our finding that the Commission has no authority to modify an original permit, we do not foresee that the question posed by Point IX will resurface.

Point X repeats Appellants' argument that the Commission lacked authority to modify the permit. Here, the challenged modification is one requiring "AES to test burn 'Atlas Petrogel'" during the "ramp-up" period and report the results to DNR. Again, we cannot imagine this error recurring. Additionally, Point X asserts that for the burn test to be valid, the Commission should have specified the quantity of petrogel to be used in the test. Through comments at oral argument, we know that both the shake-down phase and trial burn for the facility are complete. From that, it is reasonable to presume that test data from the trial burn is now available, thus providing evidence about the adequacy of the quantity of test material used. It serves no useful purpose to address this point if results from the petrogel trial burn shed new light on the issue.

In Point XII, Appellants complain because the Commission's order did not require the trial burning of the Atlas Electric Detonator, a projected waste feed for the incinerator, and that by not doing so, the trial burn plan does not demonstrate the operation of the incinerator under its worst-case conditions. We do not review this point for the same reason we declined to decide Point X.

In Point XIII, Appellants aver that by modifying the AES permit without remand to DNR, the Commission deprived Appel-

lants and the public of their rights to public comment and participation as to proposed changes in permit conditions, thus violating their due process rights under both the federal and state constitutions. Obviously, this claim should not re-appear.

The judgment affirming the Commission's orders of January 20, 1993, and May 21, 1993, and further ordering the permit issued by DNR, as modified by the Commission, to remain in full force and effect, is reversed. The action is remanded to the Circuit Court with directions to remand to the Commission. In its order of remand, the Circuit Court shall direct the Commission to remand to the DNR to afford DNR the opportunity to address, under current statutes, existing regulations, and present circumstances the permit modifications attempted by the Commission via its January 20, 1993, and May 21, 1993, orders and other permit modifications, if any, necessitated by changes in statutes, regulations, or circumstances occurring after May 21, 1993. The Commission's order shall direct DNR to afford public participation in permit modification proceedings to the extent required by law.

PARRISH and MONTGOMERY, JJ., concur.

FLANIGAN, J., recuses.