**SAXONY LUTHERAN HIGH SCHOOL, INC.,**
Respondent,

v.

**MISSOURI DEPARTMENT OF NATURAL RESOURCES** and Missouri Land Reclamation Commission, and, Strack Excavating, LLC, Appellants.

No. ED 99038.

Missouri Court of Appeals, Eastern District, Division Five.

May 14, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 26, 2013.

Application for Transfer Denied Aug. 13, 2013.

Chris Koster, Jennifer S. Frazier, Jefferson City, MO, Brian E. McGovern, Robert A. Miller, St. Louis, MO, for appellants Strack Excavating.

Stephen G. Jeffrey, Bruce A. Morrison, St. Louis, MO, for respondent.

GARY M. GAERTNER, JR., Chief Judge.

### Introduction

Appellants Strack Excavating, LLC (Strack) and the Missouri Land Reclamation Commission (Commission) appeal the circuit court's judgment reversing the Commission's issuance of a permit to Strack for construction of a limestone mining operation. Strack and the Commission argue the Commission properly imposed a condition on Strack's application that brought it into compliance with legislation passed while the permit application was pending, and thus the Commission's conditional approval was appropriate. Saxony Lutheran High School (Saxony) argues that by imposing a condition on the permit, the Commission acted in excess of its power, and the circuit court properly vacated the permit. We reverse.[1]

### Background

On November 4, 2010, Strack submitted an application to the Missouri Land Reclamation Commission for a permit to operate a limestone mine near Fruitland, Missouri.[2] Saxony is located directly south of Strack's property, and the two properties share a border. Saxony is an accredited school and has operated in that location since November of 2004.

Pursuant to the Missouri Land Reclamation Act (Act),[3] Strack submitted its application for a permit to operate a limestone mine on 76 acres of its property. After Strack was notified by the Department of Natural Resources (DNR) that its application was complete, Strack published notice of its application pursuant to Section

---

1. Saxony's Application for Award of Attoneys' Fees and Expenses is therefore denied as moot.

2. The record indicates around the same time, the Director received another application to operate a surface mine in the same general area of Fruitland, Missouri.

3. Sections 444.760–444.790, RSMo. (Supp. 2012). The Act is administered by the Director of the Department of Natural Resources. Section 640.010, RSMo. (Supp. 2012).

444.772.10.[4] After considering comments received by the public, the Director of the DNR (Director) made his recommendation to the Commission as required by Section 444.773.3, which was for approval of the permit. Saxony requested a formal public hearing to contest the permit, which the Commission granted under Section 444.773.3. The issue at the hearing was whether Saxony's health or livelihood would be unduly impaired by impacts from the operation of Strack's proposed limestone mine. A hearing officer conducted the hearing on July 5, 6, 7, and 12, 2011.

On July 11, 2011, Governor Jay Nixon signed Missouri House Bill 89, which became effective immediately, pursuant to an emergency clause in the bill. This bill created Section 444.771, which prohibits the Commission from issuing a surface mining permit for any mine plan whose boundary is within 1000 feet of "any real property where an accredited school has been located for at least five years." Strack's permit application listed its southern "approximate limit[ ] of mining" just 55 feet from Saxony's northern border.

Because Section 444.771 became effective before the last day of the hearing, Saxony requested that the hearing officer cease taking new evidence and deny Strack's permit application in light of its noncompliance with the new law. The hearing officer denied this request for an accelerated determination. Strack filed a memorandum consenting to revise its mine plan and to move the mine's boundary north, 1000 feet from Saxony's property. Strack also filed a motion requesting issuance of its permit pursuant to the revised mine plan boundary. The hearing officer issued his recommendation on August 24, 2011, which, first, contained findings that Saxony had not met its burden to show that its health or livelihood would be undu-

ly impaired by Strack's mine operation, under both the old and new statutory requirements. Second, the hearing officer found that the nature of Strack's property was such that its mine plan could be revised to accommodate the new 1000–foot buffer requirement of Section 444.771, and the hearing officer recommended approving Strack's permit subject to the condition that Strack's mine plan be revised to accommodate the 1000–foot buffer.

The Commission adopted the hearing officer's recommendation and issued its Final Order on September 22, 2011. The order granted Strack a permit to operate a mine, subject to the condition that the mine plan boundary be 1000 feet from Saxony's property line.

Saxony requested judicial review under Section 536.100, arguing that the Commission did not have statutory authority to impose conditions on approval of Shack's permit, but rather had only the authority to approve or deny the application as written. The trial court agreed, vacated Strack's permit, and remanded to the Commission. This appeal follows.

### Standard of Review

■ Section 536.140 governs this Court's review of a contested administrative case. *Phillips v. Schafer,* 343 S.W.3d 753, 757 (Mo.App. E.D.2011). On appeal from a circuit court's review of an agency decision, we review the decision of the agency rather than that of the circuit court. *Id.* We uphold the agency's decision unless it (1) is in violation of constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is unauthorized by law for any other reason; (5) is made upon unlawful

**4.** All statutory references are to RSMo. (Supp.   2012) unless otherwise indicated.

procedure or without a fair trial; (6) is arbitrary, capricious, or unreasonable; or (7) involves an abuse of discretion. *Id.* We review questions of law *de novo.* *Id.*

### Discussion

Though Saxony is the Respondent on appeal, as the non-prevailing party at the agency level, Saxony filed the first brief on appeal. Mo. R. Civ. P. 84.05(e).[5] In it, Saxony raises two points. First, Saxony argues the Commission acted in excess of its statutory authority when it conditioned approval of Strack's permit application upon Strack's revision of its mine plan boundary to 1000 feet from Saxony's property. Second, Saxony argues that by approving Strack's permit subject to modification, the Commission effectively violated Section 444.772.10 in that the public was not properly notified of the acreage of Strack's new mine plan.

### Point I

■ Saxony argues the Commission acted in excess of its statutory authority when it issued Strack's permit, because the Act does not give the Commission authority to condition approval of a surface mining permit application upon a revision that would bring the mine plan into compliance with statutory boundary requirements. We disagree.

■ The fundamental principle governing this issue is that administrative agencies, as products of the legislature, "possess only those powers expressly conferred or necessarily implied by statute." *Bodenhausen v. Mo. Bd. of Registration for Healing Arts,* 900 S.W.2d 621, 622 (Mo. banc 1995). Where there is no express power granted to an agency for a particular action, such power is properly implied "only . . . if it necessarily follows from the language of the statute." *Scheble v. Mo. Clean Water Comm'n,* 734 S.W.2d 541, 556 (Mo.App. E.D.1987). Yet, remedial legislation, such as the Act, "should be broadly and liberally construed to effect its plain purpose." *See id.*

■ The stated purpose of the Act is to "strike a balance" between surface mining of materials and reclaiming land that has been disturbed by such surface mining, for the conservation of land and preservation of natural resources. Section 444.762; *Lincoln Cnty. Stone Co., Inc. v. Koenig,* 21 S.W.3d 142, 145 (Mo.App. E.D.2000). To that end, among the powers granted to the Commission under the Act is the power to "[e]xamine and pass on all applications and plans and specifications submitted by the operator. . . ." Section 444.767.3. Before the application reaches the Commission, however, the Director initially receives the application and reviews it. Once the Director deems the application complete, there is a period of public notice and comment, followed by a recommendation by the Director for issuance or denial of the application. Sections 444.772.10; 444.773.1. If the Director recommends issuance, the Act allows an opportunity for those whose health, safety, or livelihood may be harmed by approval of a particular permit to request a formal hearing by the Commission, in order for the Commission to resolve the public's concerns before passing on the application. Section 444.773.3. The Commission then makes the final decision on the permit application. Section 444.789.3.

However, the Act is silent as to whether the Commission's final decision, passing on the permit application and resolving the concerns of the public, is limited to approving or denying the permit application as written, or includes the ability to place

---

5. All rule references are to Mo. R. Civ. P. (2012), unless otherwise indicated.

conditions on the application before approving it. We find no Missouri case addressing this issue. An even narrower issue is presented here: that is, whether the Commission may condition approval specifically by requiring a modification to the mine plan that would bring the proposed operation into compliance with existing law.[6]

Regarding the more general question of whether the Commission has authority under the Act to condition permit approval for any reason, Saxony argues the Commission does not have such authority by comparing the Act to the statutory schemes of several other agencies housed in the DNR. Saxony relies principally on the case of *Mueller v. Missouri Hazardous Waste Management Commission*, 904 S.W.2d 552 (Mo.App. S.D.1995). In that case, the court found that the Missouri Hazardous Waste Management Commission (HWMC) did not have statutory authority to modify permits when reviewing them on appeal from issuance by the DNR, in part because the legislature had expressly empowered other DNR commissions to do so, but had not used the same language with respect to the HWMC. *Id.* at 558.[7] Saxony argues that the same silence with regard to the Commission's power is present here, and thus the Com-

mission, like the HWMC, has no power to modify permits.

■ However, Saxony's reliance on *Mueller* in this respect is misplaced, because the power to modify a permit after it has been issued is different than the power to impose a condition on a permit as part of the process of initial approval. Here, we are not concerned with whether the Commission has the power to modify a permit after it has already been issued. The HWMC's role in the hazardous waste permitting process (as well as the roles of the commissions compared to the HWMC in *Mueller*) is different than the Commission's role under the Act regarding surface mining permits. The HWMC considers permits that have already been approved on appeal, whereas the Commission, in the context of applications that are contested by third parties, passes on the permit applications in the first place.

This distinction in respective roles becomes significant when examining the rationale in *Mueller*. There, the court noted the legislature's intent that the public would be involved in the hazardous waste facility permitting process. *Id.* at 558. The court concluded that allowing the HWMC to modify permits after that process and after the DNR's resulting deci-

---

**6.** We note this is a scenario that should not often arise under the Act because the circumstance here is unique in that the statutory requirements changed after the Director had determined Strack's application was compliant with the Act. However, under the Act, an application that is not technically compliant can be deemed complete. *See* Section 444.772.10 (stating if Director does not act on application within 45 days, application will be deemed to be complete); *Lake Ozark/Osage Beach Joint Sewer Bd. v. Mo. Dept. of Natural Res.*, 326 S.W.3d 38, 42 (Mo.App. W.D.2010) (publication of notice not triggered by application actually being complete but by Director deeming it complete). When an application deemed complete, but not compliant,

progresses through public notice, comment, and hearings, the question of whether the Commission has the power to condition approval of the permit upon the applicant correcting the deficiency could be raised in this circumstance as well.

**7.** The court also emphasized that the HWMC was expressly authorized elsewhere in its own enabling statutes to modify other types of DNR orders on appeal, therefore the fact that such power was not expressly granted in sections addressing appeals of DNR permits was strong evidence of the legislature's intent not to grant the power to modify permits on appeal. *Mueller*, 904 S.W.2d at 558.

sion would undermine the legislative intent for public involvement. *Id.* Conversely, here, while the Act does contain express provision for the public to be involved in the permit process, no such danger of undermining that process exists if the Commission modifies a permit, because a public hearing is actually part of the deliberative process before the Commission decides. Section 444.773.3 (Commission conducts hearing "to formally resolve concerns of the public"). Therefore, the *Mueller* court's conclusion that "[t]he authority to modify is not necessary to the efficient performance of the [HWMC]'s duty to review an appeal from a permit issuance or denial," 904 S.W.2d at 559, does not settle our question here of whether the authority to conditionally approve a permit in such a way as to ensure the permit's compliance with statutory requirements is necessary to the efficient performance of the Commission's duties under the Act to pass on permit applications and resolve concerns of the public.

Saxony also compares the Act to the enabling statutes of four other agencies housed within the DNR, all of which contain express authority to impose conditions when initially issuing permits. In all of these other contexts, Saxony points out that the issuing entity (the DNR or the Director) is granted express power by the legislature to approve permits with conditions, whereas the Act does not expressly give any entity the authority to do so. *See* Section 260.205.5(7) (solid waste; DNR may impose conditions it deems appropriate); Section 260.395.2 (hazardous waste; DNR may impose conditions it deems necessary to protect health of humans and environment); Section 643.075.2 (air conservation; Director may impose conditions he deems necessary to ensure source will meet statutory requirements); Section 644.051.3 (water pollution; same). Saxony argues that the legislature clearly knows how to grant this power to impose conditions if it intends to, and because the legislature did not expressly grant the power to impose conditions on permit approvals anywhere in the Act, the legislature intended to withhold such power from the Commission.

However, an important precondition to the power to impose a permit condition in each of the statutes Saxony cites is that the Director or DNR must first find that the permit application meets the minimum statutory requirements, as well as any applicable rules and regulations. Once satisfied, the Director or DNR is then required to approve the application, with the option of imposing conditions where necessary or appropriate. Sections 260.205.5(7); 260.395.2; 643.075.2; 644.051.3. None of these statutes indicate whether the issuing entity has authority to impose a condition upon a permit that is noncompliant with applicable requirements, in order to bring that application into compliance; and in fact, these sections indicate, expressly or by implication, that a noncompliant permit must be denied.[8] Conversely, the Act here states that the Director shall *recommend* denial of a noncompliant permit application, but the Commission itself retains the ultimate authority to grant or deny the permit after a public hearing. Sections 444.773.1–2; 444.789.3. This is one signifi-

---

8. Two of those sections expressly require the Director to deny an application that does not conform with applicable statutes, rules, and regulations. Sections 643.075.2; 644.051.3. The other two enabling statutes suggest that noncompliant applications will prompt a de- nial. *See* Sections 260.205.5(7) ("In the event that the facility or area fails to meet the rules and regulations ... the [DNR] shall issue a report to the applicant stating the reason for denial of a permit"); 260.395.2.

cant difference between the Act and the other statutory schemes listed above.

Additionally, none of the other agencies' enabling statutes contain language granting their respective commissions, the Director, or the DNR, the express overarching power to "pass on" all permit applications, which is the language used in the Act in one of the introductory sections entitled "Powers of Commission— ...." Section 444.767. Therefore, these comparisons to other statutory schemes containing powers to conditionally approve permits as part of different permit processes are ultimately unhelpful in resolving the question before us: whether the Commission's power to pass on permit applications after receiving the Director's recommendation includes the power to impose a condition upon a permit that would bring a proposed surface mining operation that is deficient regarding statutory requirements into compliance.

Hence, we must interpret the words "pass on" as used in the Act. Our primary role in doing so is to ascertain the intent of the legislature from the language used and give effect to that intent if possible. *Abrams v. Ohio Pac. Express*, 819 S.W.2d 338, 340 (Mo. banc 1991). We give the words used their plain and ordinary meaning, generally derived from a dictionary. *Id.* It is a "norm of statutory construction that every word, clause, sentence, and provision of a statute must have effect." *Civil Serv. Comm'n of City of St. Louis v. Members of Bd. of Aldermen of City of St. Louis*, 92 S.W.3d 785, 788 (Mo. banc 2003) (internal quotations omitted). If possible, we will not interpret one section in a way that brings it into contradiction or conflict with another section. *Reorganized Sch. Dist. No. R–8 of Lafayette Cnty. v. Robertson*, 262 S.W.2d 847, 850 (Mo.1953). We also "presume the legislature did not in-

tend to use superfluous, meaningless, and redundant language." *Moore v. State*, 318 S.W.3d 726, 731 (Mo.App. E.D.2010). Finally, we reiterate our standard here that we broadly interpret the Act to effect its plain purpose, and a power may be implied only where it necessarily flows from the language of the statute. *Scheble*, 734 S.W.2d at 556.

■ The plain meaning of "pass," in this context, is "[t]o pronounce or render an opinion, ruling, sentence, or judgment." *Black's Law Dictionary* 1233 (9th ed.2009). This definition suggests the Commission is empowered to consider the evidence in front of it and render its decision. *See also* Section 444.789 (laying out formal hearing procedure). When read in context of the Act's purpose to "strike a balance" between the interests of operators and the interest of the public to have affected land restored, it is clear the legislature intended that the Commission would exercise judgment and craft a decision that would balance those interests. Additionally, under Section 444.773.3, the purpose of having a contested permit hearing is for the Commission to "resolve concerns of the public." This indicates the Commission will consider the views of the operator as well as those of anyone whose health, safety, or livelihood may be in danger and will determine an appropriate course of action. Saxony's argument would limit the Commission's ability to balance and resolve concerns to simply approving or denying an application, yet the plain meaning of "pass on" does not suggest the Commission's role is limited essentially to just checking one of two boxes on a form.

■ Reading these words together with other sections of the Act confirms this conclusion. Section 444.787.2 empowers the Director to attempt to eliminate "violation[s] of any provision of [the Act] or any rule or regulation promulgated by the

[C]omission or any *condition imposed on the permit....*" (emphasis added). Saxony argues that the italicized language refers to conditions of the permit that were self-imposed by the permit applicant pursuant to the Commission's regulations. However, the section already mentions the Commission's regulations in the preceding phrase, "any rule or regulation," so Saxony's interpretation would render the subsequent phrase "or any condition imposed" superfluous. Thus, we decline to limit the interpretation of those words as Saxony does. *See Moore*, 318 S.W.3d at 731 (we presume legislature did not include superfluous language). Rather, we believe this section provides further confirmation that the Commission's power to "pass on" permit applications includes the ability to impose conditions upon applications that would bring them into compliance with existing law.[9]

Beyond the Act, this same Commission also exercises the identical power to "pass on" permit applications for surface coal mining permits. Section 444.810.1(3). In the Surface Coal Mining Law,[10] the permitting process expands on this power, and the statute states that both the Director and the Commission, at different stages in the process, may require modification of the permit as an alternative to simply granting or denying it. Sections 444.835.1; 444.850.4–5. While the same argument that Saxony makes elsewhere could be made here under the maxim *expression unius est exclusion*—the express

inclusion of this language in the Surface Coal Mining Law suggests intentional exclusion in the Act; we, in exercising the great caution with which this maxim is to be applied, do not find it applicable here. *See Pippins v. City of St. Louis*, 823 S.W.2d 131, 133 (Mo.App. E.D.1992). Instead, we find that in light of the identical powers given to the Commission in the Act and in the Surface Coal Mining Law, the additional detail of what the power to "pass on" applications entails in the Surface Coal Mining Law actually informs us how we should interpret the same power to "pass on" applications in the Act. *See Angoff v. M & M Mgmt. Corp.*, 897 S.W.2d 649, 655 n. 3 (Mo.App. W.D.1995).

Moreover, we have examined several DNR agencies that issue permits, which also confirm that the legislature intended the Commission to have power to conditionally approve permits. As we have noted, every DNR agency we have examined includes a provision in some way for conditional approval of a permit.[11] Saxony therefore essentially urges that the Act is an anomaly, because neither the Director, the DNR, nor the Commission would have power under the Act under any circumstance to impose conditions on permits. Yet we have no reason to believe the legislature intended this agency to be the only permit-granting entity without power to impose conditions on such permits during the process.

Furthermore, as we have seen, the Act does not require automatic denial

---

9. We also note that while no court has analyzed the Commission's authority to impose conditions, one case noted the factual circumstance in which the Commission had imposed certain conditions, not necessarily related to any particular statutory requirement, on a permit granted under the Act. *See Lake Ozark*, 326 S.W.3d at 41–42. Whether the Commission had the authority to do so in that case was not at issue on appeal.

10. Sections 444.800–444.940.

11. While some agencies do not appear to allow the type of conditions we address here because noncompliance with statutory requirements would require denial, there is nevertheless a provision in every DNR agency for some discretion to impose necessary or appropriate conditions before permit approval.

by the Director or the DNR if an application does not conform to statutory requirements and regulations, but rather leaves that decision solely to the discretion of the Commission. Yet, if the Commission has no power to correct a noncompliant application, then once the Commission considers such application, the Commission would have to automatically deny the permit outright. In such an interpretation of the Act, there is absolutely no purpose for notifying the public, receiving public comments, holding any public hearings, or reserving the final decision to the Commission on a permit application that will have to be denied regardless, and could simply have been denied by the Director in the first place. Moreover, requiring outright denial of a noncompliant permit at the conclusion of a lengthy period of public notice, comment, and hearings, only to result in a re-application and another round of public involvement, suggests a needlessly inefficient administrative process.

■ Finally, interpreting the Act as withholding the power to conditionally approve a permit would also mean that the Commission, which is charged with enforcement of the Act, would have no power to make a decision, short of denial, that would bring the permit into compliance with the Act. For all these reasons, we find the only logical conclusion is that the Commission's power to "pass on" applications under the Act includes the ability to conditionally approve permit applications in ways that align with the Act and fulfill the Commission's purpose to balance interests. *See Civil Serv. Comm'n,* 92 S.W.3d at 788.

Our final consideration involves the particular circumstances here. These particular circumstances confirm that the Commission's decision with regard to Strack's permit was both authorized by statute and entirely appropriate on a very practical level. The fact that Section 444.771 came into effect the day before the final day of the formal public hearing in front of the Commission meant that the first opportunity for Strack to comply with this new section was when the application was in front of the Commission. Rather than opposing a condition requiring such compliance, Strack immediately filed a memorandum consenting to change its boundary line in the event the Commission deemed it necessary to comply with the new 1000–foot buffer requirement. Finally, Saxony's particular concern the Commission was addressing—namely, the proximity of the mine to the school—was the same concern that the legislature addressed with the emergency enactment of Section 444.771. Unlike in *Mueller,* the Commission's modification to Strack's permit did not undermine the public process; it fulfilled it.

For all the foregoing reasons, we conclude the Commission had the authority to conditionally approve Strack's permit upon relocation of Strack's mine plan boundary to 1000 feet from Saxony's property line. Point denied.

### Point II

■ In Point II, Saxony argues that the Commission's conditional approval of Strack's permit application renders the application noncompliant with the public notice requirements of the Act. Saxony argues the permit should therefore be vacated. We disagree.

Section 444.772.10 requires that the public be notified of, among other things, the acreage of any proposed mine. The public was originally informed that Strack intended to build a 76–acre mine. The parties agree that, as a result of the condition imposed on Strack's permit, the only change to the information reported to the public is that the size of the mine would be reduced from 76 acres to 53 acres. Saxony argues that such change required an

additional round of public comment because the change in the mining area could affect the mining operations and potentially increase adverse affects on nearby residents.

However, here, all parties with standing have been heard by the Commission. The Commission found Saxony had shown no reason to find that the reduction in acreage would have produced additional parties with standing to challenge the mine, nor that Saxony itself was prejudiced by the reduction in acreage. "Only prejudicial error is reversible error." *Lake Ozark*, 326 S.W.3d at 43 (quoting *Campbell v. Dir. of Revenue*, 297 S.W.3d 656, 659 (Mo.App. W.D.2009)) (internal alterations omitted). The Commission found no prejudice, and Saxony has not shown an abuse of discretion on the part of the Commission or any other basis for overturning this finding. *See Phillips*, 343 S.W.3d at 757. Point denied.

### Conclusion

In light of the plain meaning of the power to "pass on" permit applications, the context in the Act that the Commission resolves the concerns of the public and enforces conditions imposed on permits, as well as the purpose of the Act to strike a balance between various interests, the broader DNR context, and the special circumstances here of a change in legislation while the permit was pending and Strack's consent to revise its application accordingly, we find that the Commission had the authority to approve Strack's permit subject to the condition that Strack relocate its mine plan boundary in accordance with Section 444.771. Additionally, the Commission did not abuse its discretion in concluding that Strack was not required to notify the public of the reduction in the proposed acreage of Strack's mine. Thus, we reverse the judgment of the circuit court, and we remand to the circuit court with instructions to reinstate the decision of the Commission.

ROBERT M. CLAYTON III, J. and ELIZABETH B. HOGAN, S.J., concur.